Opinion
KITCHING, J.
Applied behavior analysis (ABA) is an intensive form of therapy which has had documented success in treating the symptoms of autism in young children. While ABA can be performed by a licensed physician or psychologist, it is often performed, or supervised, by an individual certified by the private Behavior Analyst Certification Board (BACB). The issue raised by this case is whether the Department of Managed Health Care (DMHC) is required, by law, to direct health plans within its jurisdiction to provide coverage for ABA when provided, or supervised, by BACBcertified therapists who are not otherwise licensed. DMHC contends that it may require plans to cover ABA therapy only when it is provided by someone licensed to practice medicine or psychology. Plaintiff, Consumer Watchdog,[1] argues that nonlicensed, but BACB-certified, ABA therapists[2] are, in fact, recognized by the medical community as proper providers and supervisors of ABA therapy. Thus, their services should be covered by the plans. Consumer Watchdog sought a writ of mandate directing DMHC to respond to plan member grievances challenging a denial of coverage for ABA therapy provided by a BACB-certified therapist by ordering the plan to cover such therapy. The trial court denied the petition.
We conclude that a statute recently enacted by the Legislature authorizes BACB-certified providers to perform ABA therapy under state licensing laws and, therefore, DMHC can no longer uphold a plan’s denial of coverage on the basis that a BACB-certified provider is not licensed. We also hold that the trial court correctly resolved Consumer Watchdog’s challenge to a DMHC policy as violative of the Administrative Procedure Act (Gov. Code, § 11340 *868 et seq.). The judgment is reversed in part and modified to enjoin DMHC from upholding a plan’s denial of ABA services where the basis for the denial is that a BACB-certified provider is not licensed. In all other respects the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In addition to discussing the factual and procedural background of the instant litigation, we also consider the relevant legislative framework. Additionally, we discuss statutory developments which occurred after the trial court issued its judgment.
1. Autism and ABA
“According to a 2007 report of the California Legislative Blue Ribbon Commission on Autism, ‘[a]utism spectrum disorders are complex neurological disorders of development that onset in early childhood.’ [Citation.] These disorders, which include full spectrum autism, ‘affect the functioning of the brain to cause mild to severe difficulties, including language delays, communication problems, limited social skills, and repetitive and other unusual behaviors.’ [Citation.] Nationally, autism spectrum disorders affect an estimated one in every 150 children across all racial, ethnic, and socioeconomic backgrounds. [Citation.]” (Arce v. Kaiser Foundation Health Plan, Inc. (2010) 181 Cal.App.4th 471, 478 [104 Cal.Rptr.3d 545], fn. omitted.) Amici curiae Autism Speaks and Autism Deserves Equal Coverage represent that, under more current data, the prevalence rate for autism is approximately one in every 88 children.
ABA is a form of behavioral health treatment which develops or restores, to the maximum extent practicable, the functioning of an individual with autism. (Health & Saf. Code, § 1374.73, subd. (c)(1).) Numerous studies indicate that ABA is the most effective treatment known for autistic children. Studies also demonstrate that ABA has lasting results. Autism is understood to be a brain-based neurological disorder. ABA therapy can create new brain connections in a child with autism; these new connections are to be contrasted with the abnormal connections caused by autism. Neither party in this case disputes that ABA is an effective medical treatment for many young autistic children.
ABA is a time-intensive treatment. It is often prescribed for 26 to 40 hours per week. While there can be no doubt that the treatment plan for providing ABA to any autistic child must be established, modified, and supervised by a qualified expert in ABA, the evidence in this case indicates that the actual delivery of services to the child may be performed by a nonexpert. A *869 publication by the BACB suggests that a frontline behavioral technician need only be a high school graduate who has subsequently received training in basic ABA procedures and demonstrated competency. (BACB, Guidelines: Health Plan Coverage of Applied Behavior Analysis Treatment for Autism Spectrum Disorder (ver. 1.1, 2012) p. 27.) It appears that ABA, and similar behavior therapies, are somewhat unique among medical treatments in this respect. While the treatment plan must be created, modified, and supervised by a professional, a paraprofessional may actually deliver the services.
The field of ABA is relatively new. The landmark study often cited as the first to establish the effectiveness of ABA in autistic children was published in 1987. (Lovaas, Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children (1987) 55 J. Consulting Clinical Psychol. 3.) The BACB, a private organization established to grant national credentials to ABA professionals (not frontline providers), was established in 1998. (<http://www.bacb.com/index.php?page=l> [as of Apr. 23, 2014].) When health plan members first sought coverage for ABA, plan denials were upheld on the basis that ABA was experimental. Independent medical review[3] panels did not uniformly recognize ABA as a medically necessary treatment until 2007.
The BACB has three levels of certification: (1) Board Certified Behavior Analyst (requires a master’s degree in a related field, 225 hours of graduate coursework in behavior analysis, substantial supervised experience, and passing an examination); (2) Board Certified Assistant Behavior Analyst (requires a bachelor’s degree, 135 hours’ undergraduate or graduate coursework in behavior analysis, a lesser amount of supervised experience, and passing an examination); and (3) Board Certified Behavior Analyst-Doctoral (requires a Board Certified Behavior Analyst certification and a doctorate degree in a related field).
2. The Knox-Keene Act and Mental Health Parity Act
In 1975, the Legislature enacted the Knox-Keene Health Care Service Plan Act of 1975, informally known as the Knox-Keene Act (Knox-Keene). (Health & Saf. Code, § 1340 et seq.) Under Knox-Keene, DMHC “has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees.” (Health & Saf. Code, § 1341, subd. (a).)
Knox-Keene directs plans to provide all “basic health care services” to their subscribers and enrollees. (Health & Saf. Code, § 1367, subd. (i).) *870 Basic health care services are defined to include physician services, hospital inpatient services, diagnostic laboratory services, home health services, and preventive health services. (Health & Saf. Code, § 1345, subd. (b).) DMHC’s director is authorized to define the scope of required basic health care services. (Health & Saf. Code, § 1367, subd. (i).) By regulation, home health services (as part of basic health care services) are defined to include “where medically appropriate, health services provided at the home of an enrollee as prescribed or directed by a physician . . . .” (Cal. Code Regs., tit. 28, § 1300.67, subd. (e).) The parties agree that ABA can constitute a home health service; the dispute in this case concerns the identity of the proper ABA provider.
Licensure requirements are addressed in Knox-Keene. Health and Safety Code section 1367, subdivision (d) provides that a plan shall furnish “ready referral of patients to other providers” as appropriate. Knox-Keene defines a “provider” as “any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services.” (Health & Saf. Code, § 1345, subd. (i).) Health and Safety Code section 1367, subdivision (b) provides that “[personnel employed by or under contract to the plan shall be licensed or certified by their respective board or agency, where licensure or certification is required by law.” Subdivision (f) requires the plan to “employ and utilize allied health manpower for the furnishing of services to the extent permitted by law and consistent with good medical practice.” In short, Knox-Keene requires the use of licensed individuals when a license is required by law.
In 1999, the Legislature enacted Health and Safety Code section 1374.72, commonly referred to as the Mental Health Parity Act (MHPA). That statute provides that, beginning in July 2000, every health plan providing hospital, medical or surgical coverage- must also “provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child” as specified in the statute. (Health & Saf. Code, §1374.72, subd. (a), italics added.) The statute specifically itemizes the “ ‘severe mental illnesses’ ” that must be covered, including “[pjervasive developmental disorder or autism.” (Health & Saf. Code, § 1374.72, subd. (d)(7).) Thus, the MHPA requires all plans providing coverage under Knox-Keene to cover the “medically necessary treatment” of autism. The MHPA does not specifically define the term “medically necessary treatment,” although it does state that certain benefits— outpatient services, inpatient hospital services, partial hospital services, and prescription drugs (if the plan otherwise covers prescription drugs)—must be provided. (Health & Saf. Code, § 1374.72, subd. (b).)
*871 3. Resolution of Grievances
“As part of its legislative mandate to ‘ensure’ access to quality care, the Department is required to establish a bifurcated grievance system and to ‘expeditiously’ and ‘thoroughly’ review patient grievances.” (California Consumer Health Care Council, Inc. v. Department of Managed Health Care (2008) 161 Cal.App.4th 684, 687 [74 Cal.Rptr.3d 215].) The independent medical review (IMR) grievance system resolves “disputed health care services.” (Health & Saf. Code, § 1374.30.) The other system, which we refer to as the “standard grievance” system, resolves all other grievances, including coverage disputes.
To be resolved under an IMR, a grievance must concern a “disputed health care service,” which is defined as any service “eligible for coverage and payment under a health care service plan contract that has been denied, modified, or delayed by a decision of the plan . . . due to a finding that the service is not medically necessary. A decision regarding a disputed health care service relates to the practice of medicine and is not a coverage decision.” (Health & Saf. Code, § 1374.30, subd. (b), italics added.)
When a grievance is resolved pursuant to an IMR, an independent medical reviewer (or reviewers) determines whether the disputed health care service is medically necessary based on the specific needs of the patient and such information as peer-reviewed scientific evidence, nationally recognized professional standards, and generally accepted standards of medical practice. (Health & Saf. Code, § 1374.33, subd. (b).) A plan must promptly implement the decision of an IMR. (Health & Saf. Code, § 1374.34, subd. (a).) If the IMR decision is in favor of the patient, the plan shall either promptly authorize the services or reimburse the provider or the enrollee for services already rendered. (Ibid.)
In contrast, the standard grievance process is an administrative review conducted by DMHC. When a plan denies or delays services on the basis that the services are not covered under the plan, the plan is required to clearly specify the contract provisions that purportedly exclude coverage. (Health & Saf. Code, § 1368, subd. (a)(5).) If the patient disagrees, the patient may seek review by the DMHC by means of a standard grievance. (Health & Saf. Code, § 1368, subd. (b)(1)(A).) The DMHC reviews the record and determines whether the challenged service is, in fact, covered. (Health & Saf. Code, § 1368, subd. (b)(5).)
4. DMHC’s Practice Regarding ABA Grievances—The March 2009 Memo
Plan denials of ABA coverage could involve both issues—i.e., whether ABA is medically necessary and whether ABA is covered by the plan. *872 Initially, when the denials appeared to raise both questions, DMHC chose to send ABA grievances to IMR. As noted above, some of the early IMR decisions on ABA upheld the plans’ denials on the basis that ABA was experimental and did not yet constitute the standard of care. By late 2007, however, IMR decisions regarding ABA were consistently resolved in favor of its medical necessity.
As ABA became more medically accepted, plans focused their denials on coverage grounds. For example, some plans denied coverage for ABA by BACB-certified therapists because the plans did not provide coverage for mental health services provided by an unlicensed individual. Other plans denied coverage for ABA based on an exclusion for any treatment which could safely and effectively be provided by an unlicensed individual.
On March 9, 2009, DMHC issued a memorandum to health plans regarding “Improving Plan Performance to Address Autism Spectrum Disorders” (March 2009 memo). The memorandum was not adopted pursuant to the Administrative Procedure Act. Among other things, the March 2009 memo reconfirmed that plans must “[c]over all basic health care services required under [Knox-Keene], including speech, physical, and occupational therapies for persons with [autism], when those health care services are medically necessary.” The memo goes on to state that plans must “[p]rovide mental health services only through providers who are licensed or certified in accordance with applicable California law.” Thus, the March 2009 memo specifically required providers to be licensed if their services were to be covered by the plans.
With respect to grievances, the March 2009 memo states that, “[t]he DMHC will initially make a determination whether the service being sought is a covered health care service. If that determination is made in the affirmative, then any claim that a service is either; (1) experimental or investigational; or, (2) is not medically necessary to treat the patient’s condition, will be referred for IMR as required under California law.” In other words, the March 2009 memo stated that all grievances regarding services for autism raising both types of issues would first be resolved through the standard grievance procedure and would only be sent to IMR if the coverage dispute was resolved in favor of the patient.
5. The Instant Action
On June 30, 2009, Consumer Watchdog brought a petition for writ of mandate and complaint against DMHC and its director in her official capacity (collectively DMHC). Consumer Watchdog’s operative first amended petition alleges it is a violation of the MHPA “for a health plan to refuse to cover any *873 treatment for autism that is deemed medically necessary.” (Italics omitted.) Consumer Watchdog further alleges the licensing requirement imposed by the March 2009 memo is unsupported, because the law requires coverage for any medically necessary treatment for autism “when it is provided by a licensed provider, a provider that is certified by a professional organization, or individuals who are supervised by a licensed or certified provider.” (Italics omitted.)
6. Briefing, Argument, and the Trial Court’s Ruling
In support of its petition and complaint, Consumer Watchdog argued plans must provide ABA in all cases where it is medically necessary. In opposition, DMHC argued the Legislature “set forth state licensure as the bright-line consumer protection regarding practitioners of health services.” DMHC argued it could not, consistent with Knox-Keene’s licensure requirements, order the plans to provide coverage for ABA when administered by an unlicensed provider, including therapists certified by BACB—a private certification board.
The trial court concluded DMHC could, itself, impose a licensing obligation as part of its general duties to ensure that health care plans provide quality health care services and to protect the interests of enrollees. As providers of ABA work intensively with fragile autistic children, the court determined DMHC could reasonably require ABA providers to be subject to state licensing quality controls. Thus, the court concluded there was no clear, ministerial duty for DMHC to order ABA when provided by BACB-certified therapists.[4] It therefore denied the writ petition. The court observed that Consumer Watchdog’s remedy was “with the Legislature,” not the courts.
As to the causes of action challenging DMHC’s grievance resolution procedures, the trial court concluded the March 2009 memo was invalid because DMHC failed to comply with the Administrative Procedure Act in adopting the regulations. However, the court held DMHC could continue to exercise its discretion to resolve coverage disputes before sending an ABA grievance to IMR.
The trial court entered judgment directing DMHC to discontinue implementing, utilizing or enforcing the March 2009 memo. The court denied all other relief.
*874 7. The New Statute
On October 9, 2011, the Legislature enacted Health and Safety Code section 1374.73 (the ABA statute). The statute specifically governs ABA treatment. Like the MHPA, the ABA statute applies, with certain exceptions, to every health plan providing hospital, medical or surgical coverage. As of July 1, 2012, the ABA statute’s operative date, those plans are required to “provide coverage for behavioral health treatment for pervasive developmental disorder or autism.” (Health & Saf. Code, § 1374.73, subd. (a)(1), italics added.) “Behavioral health treatment” is defined to include various treatment programs, and explicitly includes ABA. (Health & Saf. Code, § 1374.73, subd. (c)(1).) To constitute behavioral health treatment which must be covered, the following criteria must be met: (1) the treatment must be prescribed by a licensed physician or psychologist; (2) the treatment must be provided under a treatment plan prescribed by a “qualified autism service provider,” and be administered by either a qualified autism service provider, or a “qualified autism service professional” or “qualified autism service paraprofessional” supervised by the qualified autism service provider; (3) the treatment plan must have measurable goals and be reviewed at least every six months by the qualified autism service provider; and (4) the treatment plan must not be used for daycare or educational services. (Health & Saf. Code, § 1374.73, subd. (c)(l)(A)-(D).)
A “qualified autism service provider” is defined as a person either (1) licensed under California law (as a physician, psychologist, occupational therapist, or one of several other entimerated professionals) who designs, supervises or provides treatment for pervasive developmental disorder or autism (Health & Saf. Code, § 1374.73, subd. (c)(3)(B)); or (2) “certified by a national entity, such as the [BACB] and who designs, supervises, or provides treatment for pervasive developmental disorder or autism” (Health & Saf. Code, § 1374.73, subd. (c)(3)(A)).
A “qualified autism service professional” is defined as anyone approved “as a vendor by a California regional center to provide services as an Associate Behavior Analyst, Behavior Analyst, Behavior Management Assistant, Behavior Management Consultant, or Behavior Management Program.” (Health & Saf. Code, § 1374.73. subd. (c)(4)(D).) These categories include, by regulation, individuals certified by the BACB as “Board Certified Behavior Analysts” and “Board Certified Associate Behavior Analysts.”[5] (Cal. Code Regs., tit. 17, § 54342, subd. (a)(8) & (11).)
*875 A “qualified autism service paraprofessional” is defined as “an unlicensed and uncertified individual” who has adequate education, training, and experience, as certified by a qualified autism service provider. (Health & Saf. Code, § 1374.73, subd. (c)(5).)
In short, with respect to all health plans subject to the ABA statute, they are required to cover ABA treatment for autistic children when provided, or supervised, by a BACB-certified therapist. Thus, the ABA statute provides precisely the relief sought by Consumer Watchdog in the instant action, and Consumer Watchdog does not argue otherwise.[6]
However, three types of health plans are specifically exempted from the obligations of the ABA statute: (1) health plans in the Medi-Cal program; (2) health plans in the Healthy Families Program;[7] and (3) health plans entered into with the Public Employees’ Retirement System (PERS). (Health & Saf. Code, § 1374.73, subd. (d).) As health plans in the Medi-Cal program are also exempt from the MHPA, there are, in effect, two types of health plans (Healthy Families and PERS) that are subject to the requirements of the MHPA but not the requirements of the ABA statute.
By its terms, “[n]othing in [the ABA statute] shall be construed to limit the obligation to provide services under Section 1374.72”—i.e., the MHPA. (Health & Saf. Code, § 1374.73, subd. (e).)

ISSUES ON APPEAL

While the applicable legislative framework and procedural history of this case are somewhat complex, the issues presented by this appeal are relatively straightforward: (1) Is Consumer Watchdog’s appeal moot in light of the ABA statute? (2) With respect to the grievances filed between the date of Consumer Watchdog’s petition and the operative date of the ABA statute, should the trial court have required DMHC to direct the plans to provide ABA from BACB-certified providers? (3) What are the DMHC’s duties with *876 respect to grievances for ABA provided by BACB-certified therapists to enrollees in plans exempted from the ABA statute?
The following additional issues are also raised with respect to the March 2009 memo: (4) Is DMHC’s cross-appeal untimely? and (5) Did the trial court err in refusing to direct DMHC to return to its pre-March 2009 memo procedures?

DISCUSSION

1. Only Prospective Injunctive Relief Is Available
Because it directly impacts the issues properly before us in this appeal, we must be mindful of the limitations of Consumer Watchdog’s petition and complaint. As we discuss more thoroughly in the next part, Consumer Watchdog’s pleading sought only prospective relief, by means of writ of mandate, injunction and declaratory relief. It sought an order directing DMHC to respond to grievances in a certain way and to cease implementing the March 2009 memo. It sought no relief with respect to closed grievances. Moreover, the petition and complaint named only DMHC as a defendant. No insurance plan is named, and this case is not a class action that seeks compensation for wrongfully denied ABA services.
Because DMHC is the only defendant, the relief Consumer Watchdog sought is fundamentally overbroad. Consumer Watchdog sought a writ or injunction directing DMHC to respond to a grievance by ordering coverage for ABA where ABA was medically necessary and provided or supervised by a licensed or certified professional. But neither we, nor the trial court, could issue a blanket decision mandating coverage for ABA in every case in which it is medically necessary without first allowing the health plans an opportunity to be heard on whether their coverage exclusions apply. However, no health plan is a defendant in this action, and no policy exclusion is at issue in this case. Instead, Consumer Watchdog solely challenges DMHC’s determination that coverage is not required for mental health services rendered by a provider who is not licensed under California law.
We therefore must construe Consumer Watchdog’s petition and complaint as seeking an order enjoining DMHC from upholding a denial of coverage for medically necessary ABA treatment performed by a BACB-certified provider where the plan’s denial is based on the ground that coverage is not required when the provider is not licensed under California law. As we explain next, because Consumer Watchdog did not request to reopen closed grievances, any injunctive relief we might direct can operate only prospectively.
*877 2. Consumer Watchdog Did Not Seek Relief for Past Grievances
Following enactment of the ABA statute, we requested additional briefing from the parties concerning whether the issues raised on appeal were moot in light of the legislative action. In response, DMHC maintained the appeal was moot, citing the operative petition and complaint’s prayer for relief, which seeks only “prospective relief’ with respect to DMHC’s “future responses to enrollee grievances.” Conversely, Consumer Watchdog argued this court should direct the trial court to issue relief concerning grievances that have already been resolved by DMHC. We agree with DMHC’s position that Consumer Watchdog sought only prospective relief in the trial court.
Consumer Watchdog’s first amended petition and complaint do not seek redress for previously adjudicated grievances. Rather, with respect to mandamus and injunctive relief, the prayer for relief states: “In response to any enrollee complaint or grievance regarding a health plan’s decision to deny ABA treatment to an autistic enrollee on the ground that it is not a covered benefit, [the DMHC] shall ‘order’ the plan-where ABA is both medically necessary and is provided by ... a provider that is certified by a professional organization, or individuals who are supervised by a . . . certified provider—to either ‘promptly offer and provide’ ABA to the enrollee, or to ‘promptly reimburse’ the enrollee for ‘any reasonable costs’ associated with obtaining ABA, whichever is applicable.” (Italics added.) Similarly, with respect to declaratory relief, Consumer Watchdog sought a judicial declaration that DMHC and its director “have a legal duty to enforce the Mental Health Parity Act and the Knox-Keene Act to require that health plans shall provide coverage for ABA when both medically necessary and provided by ... a provider that is certified by a professional organization, or individuals who are supervised by a . . . certified provider.” (Italics added.) In short, the petition and complaint do not seek relief directing DMHC to reopen closed grievances and resolve them in favor of coverage.
Likewise, in its briefs to the trial court, Consumer Watchdog sought only prospective relief—a writ of mandate directing DMHC to respond to future enrollee grievances by ordering plans to cover ABA therapy, regardless of the provider’s licensure status. Consumer Watchdog also did not request relief for previously adjudicated grievances at the hearing on the petition. Because Consumer Watchdog did not seek relief regarding previously adjudicated grievances in the trial court, it cannot seek such relief in this court. (See Browne v. County of Tehama (2013) 213 Cal.App.4th 704, 725 [153 Cal.Rptr.3d 62] [petitioners forfeited an argument regarding the legality of an ordinance because they failed to challenge it on that basis in their petition]; Richmond v. Dart Industries, Inc. (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184] [a plaintiff cannot pursue a theory of relief on appeal he did *878 not pursue in the trial court]; O’Donnell v. Excelsior Amusement Co. (1930) 110 Cal.App. 685, 691 [plaintiff could not pursue a claim for punitive damages on appeal when he did not assert the claim below].)
Consumer Watchdog is not simply arguing a new legal theory to support a claim for relief it sought in the trial court. It seeks relief in this court that it did not seek below. “It is elementary that an appellate court is confined in its review to the proceedings which took place in the trial court. [Citation.] Accordingly, when a matter was not tendered in the trial court ‘. . . [it] is outside the scope of review.’ ” (Bach v. County of Butte (1989) 215 Cal.App.3d 294, 306 [263 Cal.Rptr. 565] (Bach).) “ ‘[A] judgment will not be reversed on appeal because of the failure of the lower court to give relief not embraced in the pleadings and which it was not asked to give . . . .” (Dimmick v. Dimmick (1962) 58 Cal.2d 417, 423 [24 Cal.Rptr. 856, 374 P.2d 824] (Dimmick).) “This rule precludes a party from asserting on appeal claims to relief not asserted in the trial court.” (Id. at p. 422.)
Although the concurring and dissenting opinion agrees that Consumer Watchdog’s operative pleading did not seek retroactive relief with respect to closed grievances, it nonetheless presumes that this court can grant such relief. This conclusion is based on the assumption that when a party seeks a writ of mandate it necessarily seeks a judgment granting relief as of the date the petition was filed. No apposite authority is cited for this proposition.
We are not persuaded by the concurring and dissenting opinion’s reliance on Morris v. Noguchi (1983) 141 Cal.App.3d 520 [190 Cal.Rptr. 347] (Morris). Morris does not hold, as the concurring and dissenting opinion’s citation to the case suggests, that a petitioner for writ of mandate necessarily seeks a judgment granting relief as of the date the petition is filed. On the contrary, the statement from Morris upon which the dissent relies is nothing more than the relatively unremarkable proposition, stated in dicta, that “ ‘ “[t]he act which will be compelled by mandamus must be one to the performance of which the complaining party is entitled at the institution of his proceeding.” ’ ” (Id. at p. 523.) This simply means that a mandate claim must be ripe for review when a petition is filed. It is not authority for the proposition that every possible form of relief that is ripe for review must necessarily have been sought when the mandamus petition was filed. Morris lends no support to the concurring and dissenting opinion’s argument that we should adjudicate a claim for relief that was never presented to the trial court.[8]
*879 It is not enough that Consumer Watchdog could have sought mandamus relief relating to already adjudicated grievances. The fact that it did not seek such relief necessarily limits the scope of our review. We decline to issue an advisory opinion on a claim Consumer Watchdog did not make in the trial court.
3. The Bulk of the Appeal Is Moot
“[I]t is clear under a long and uniform line of California precedents that the validity of the judgment must be determined on the basis of the current statutory provisions, rather than on the basis of the statutory provisions that were in effect at the time the injunctive order was entered. As observed by Witkin: ‘Because relief by injunction operates in the future, appeals of injunctions are governed by the law in effect at the time the appellate court gives its decision.’ [Citations.]” (Marine Forests Society v. California Coastal Com. (2005) 36 Cal.4th 1, 23 [30 Cal.Rptr.3d 30, 113 P.3d 1062].) “The reason a reviewing court applies current rather than former law when reviewing an injunctive decree is because injunctive relief operates in the future. [Citations.] It would be an idle gesture to affirm an injunctive decree because it was correct when rendered, ‘with full knowledge that it is incorrect under existing law, and with full knowledge that, under existing law, the decree as rendered settles nothing so far as the future rights of these parties are concerned.’ [Citation.] It does not matter whether the Legislature intended the new law to be retroactive. The reviewing court is interested in the law’s prospective effect since that is when the decree under review will operate.” *880 (City of Watsonville v. State Dept, of Health Services (2005) 133 Cal.App.4th 875, 884 [35 Cal.Rptr.3d 216].)
Consumer Watchdog sought prospective relief enjoining DMHC from upholding a denial of coverage for medically necessary ABA treatment provided or supervised by a BACB-certified therapist. This relief, in large measure, has been provided by the ABA statute. With respect to all plans which were not expressly excluded from the ABA statute, the statute requires those plans to provide coverage for ABA when provided or supervised by a BACB-certified therapist. DMHC concedes this and has implemented the statute. Consumer Watchdog’s appeal is largely, but not entirely, moot.
4. DMHC May Not Uphold a Denial of Coverage for ABA Performed or Supervised by a BACB-certified Therapist on the Basis the Provider Is Not Licensed, Even When the Plan Is Exempted from the ABA Statute
We must decide whether DMHC may still uphold coverage denials by plans expressly exempted from the ABA statute'; these are plans in the Healthy Families Program and plans entered into with PERS. Such plans are not required under the ABA statute to provide coverage for ABA provided or supervised by BACB-certified providers. (Health & Saf. Code, § 1374.73, subd. (d).) This does not mean, however, that these plans are relieved of their obligation to cover “basic health care services” under Knox-Keene (Health & Saf. Code, § 1367, subd. (i)) and “medically necessary treatment of severe mental illnesses” under the MHPA (Health & Saf. Code, § 1374.72, subd. (a)). Indeed, the ABA statute unequivocally states that “[njothing in this section shall be construed to limit the obligation to provide services under Section 1374.72.” (Health & Saf. Code, § 1374.73, subd. (e).)
DMHC no longer disputes that ABA can, in the appropriate case, constitute a basic health care service and medically necessary treatment for autism under Knox-Keene and the MHPA. As we explained, the dispute in this case concerns the identity of the proper providers of ABA and whether KnoxKeene’s licensure requirements preclude DMHC from directing plans to cover ABA when provided by a BACB-certified therapist who is not otherwise licensed to administer ABA. In resolving this question with respect to the plans that are excepted from the ABA statute, we must determine whether the effect of that exception is to create a separate licensing requirement when a BACB-certified therapist administers ABA to an individual enrolled in a plan that is not covered by the ABA statute. We hold that the exception cannot be interpreted to create such an inconsistent licensing regime.
The exception for PERS and Healthy Families plans does not mandate that we ignore the existence of the ABA statute when considering these *881 plans. As noted above, we apply the law as it currently exists in resolving a claim for injunctive relief on appeal. Moreover, “[wjhen two seemingly inconsistent statutes apply, we harmonize the competing statutes and ‘avoid an interpretation that requires one statute to be ignored.’ [Citation.]” (Watkins v. County of Alameda (2009) 177 Cal.App.4th 320, 343 [98 Cal.Rptr.3d 847].) As we shall explain, under current law, the argument is no longer valid that the licensure requirements set forth in Knox-Keene preclude DMHC from ordering plans to cover ABA treatment when administered by BACB-certified providers.
The ABA statute constitutes legislative approval of the practice of ABA by BACB-certified providers and individuals under their supervision. That legislative approval effectively qualifies BACB-certification as a “license” to provide ABA. Business and Professions Code section 23.7 defines “license” to mean a “license, certificate, registration, or other means to engage in a business and profession regulated by this code . . . .” (Italics added.) The ABA statute states that ABA shall be administered by a “qualified autism service provider,” and defines “qualified autism service provider” as, inter alia, “[a] person . . . that is certified by a national entity, such as the [BACB], that is accredited by the National Commission for Certifying Agencies____” (Health & Saf. Code, § 1374.73, subd. (c)(1)(B) & (3)(A).) With the passage of the ABA statute, BACB certification fits squarely within Business and Professions Code section 23.7’s definition of “license”—that is, BACB certification is, in effect, an “other means” by which one is authorized to provide ABA in this state.
Our conclusion is consistent with the broad interpretation other courts have given to the definition of “license” under Business and Professions Code section 23.7. In Prince v. Sutter Health Central (2008) 161 Cal.App.4th 971, 974 [74 Cal.Rptr.3d 750] (Prince), the court determined that an “unlicensed social worker” was a “health care provider” under the Medical Injury Compensation Reform Act (MICRA), notwithstanding that MICRA defines the term “health care provider” to mean “any person licensed or certified” under applicable licensing laws. (Civ. Code, § 3333.2, subd. (c)(1), italics added; see Prince, at p. 975.) Citing Business and Professions Code section 23.7, the Prince court held that the social worker was “[i]n effect . . . licensed,” even though she did not hold a “license” in the literal sense, because she was authorized by the Legislature to engage in the subject activities. (Prince, at pp. 975-976 [observing that social worker’s registration with the Board of Behavioral Sciences authorized her to engage in healing arts while she worked toward a license under Bus. & Prof. Code, § 4996.18, subd. (a)].)
Like the definition of “health care provider” found in MICRA, Knox-Keene defines the term “provider” to mean “any . . . person or *882 institution licensed by the state to deliver or furnish health care services.” (Health & Saf. Code, § 1345, subd. (i), italics added.) Based on this definition, DMHC has taken the position that it cannot direct plans to cover ABA treatment when the prescribed “provider” is a BACB-certified therapist who is not otherwise licensed by the state. As we have explained, with the passage of the ABA statute, BACB certification is, in effect, a “license” as defined by state licensing laws, inasmuch as the certification constitutes a legislative authorization to provide ABA in this state as a “qualified autism service provider.” (See Health & Saf. Code, § 1374.73, subd. (c)(1)(B) & (3)(B).) This authorization applies regardless of whether a plan is required, or exempted from the requirement, to provide coverage for ABA treatment by the ABA statute. That is, legislative authorization to provide ABA in this state cannot depend upon the health plan in which a patient is enrolled. To hold otherwise would create an irrational inconsistency in our state licensing laws.[9]
Thus, while the ABA statute only requires certain plans to provide coverage for ABA by BACB-certified providers and individuals under their supervision, the ABA statute also has the effect of licensing BACB-certified providers and those under their supervision to practice ABA. We stress that we are not concluding that the health plans exempted from the ABA statute are, in fact, subject to its terms. The ABA statute does not require these plans to provide ABA; we do not require them to do so, either. We simply hold that DMHC’s practice of upholding denials of coverage on the basis that BACBcertified therapists are unlicensed is no longer legally justified. With the passage of the ABA statute, the Legislature has concluded that these individuals possess sufficient qualifications such that further licensure is unnecessary.
DMHC cannot uphold a denial of coverage for ABA provided or supervised by a BACB-certified therapist on the basis that the therapist is unlicensed. Our interpretation of the legislative authorization and effective licensure of BACB-certified therapist to perform ABA in this state necessarily *883 applies even when coverage is provided by a plan that is exempted from the requirements of the ABA statute. To that extent, Consumer Watchdog is entitled to relief.
5. DMHC’s Cross-appeal Is Untimely
We next turn to issues surrounding the March 2009 memo and the trial court’s conclusions that (1) the memo violated the Administrative Procedure Act but (2) DMHC would not be required to return to its pre-March 2009 method of resolving grievances and order all grievances regarding ABA which raised both coverage and medical necessity issues to IMR.
DMHC purported to appeal from the court’s order declaring the March 2009 memo violative of the Administrative Procedure Act. We cannot reach this issue, because DMHC’s notice of cross-appeal is untimely under any applicable California Rules of Court.
The notice of cross-appeal was not filed within 60 days of service of notice of entry of judgment. (Cal. Rules of Court, rule 8.104(a)(1)(A).) The motion for new trial extended the time to appeal until 30 days after the clerk mailed notice of entry of denial. (Cal. Rules of Court, rule 8.108(b)(1)(A).) Such notice was mailed on April 1, 2011; the notice of cross-appeal was therefore not timely under that extension. Finally, a notice of appeal extends the time for filing a notice of cross-appeal until 20 days after the clerk serves notification of the first appeal. (Cal. Rules of Court, rule 8.108(g)(1).) In this case, the notification was served on April 15, 2011. The notice of cross-appeal was therefore untimely under this extension provision as well.
DMHC states it timely transmitted the notice of cross-appeal through Federal Express and provides evidentiary support for this claim. There is no evidence, however, as to when the document was delivered by Federal Express to the court. It is clear that one of two things occurred. Either (1) Federal Express erred and did not timely deliver the shipment or (2) Federal Express timely delivered the shipment, but employees of the Los Angeles Superior Court failed to timely mark the notice of cross-appeal as received.[10] DMHC, however, has no evidence that the error was the clerk’s, rather than Federal Express’s. DMHC has no tracking information from Federal Express indicating when the package was delivered and no declaration from its counsel indicating that it confirmed timely receipt of the notice of cross-appeal with the superior court clerks. Indeed, as between Federal Express and the superior court clerks, the presumption runs in favor of the clerks. “It is *884 presumed that official duty has been regularly performed.” (Evid. Code, § 664.) While there is a similar presumption that a letter correctly addressed and properly mailed has been received “in the ordinary course of mail” (Evid. Code, § 641), the statute has “no application to the filing of a notice of appeal.” (Thompson, Curtis, Lawson & Parrish v. Thorne (1971) 21 Cal.App.3d 797, 801 [98 Cal.Rptr. 753].) DMHC’s cross-appeal must therefore be dismissed as untimely.
6. The Trial Court Did Not Err in Rejecting Consumer Watchdog’s Request That DMHC Be Directed to Return to Pre-March 2009 Memo Procedures
After the trial court invalided the March 2009 memo, Consumer Watchdog sought the additional relief of an order directing DMHC to return to its pre-March 2009 methods of resolving grievances relating to the provision of ABA—specifically, to direct that those grievances be resolved under IMR. The trial court correctly denied this relief.
Health and Safety Code section 1374.30, subdivision (d)(3) grants DMHC discretion to determine whether a grievance raising an issue of medical necessity is to be resolved in IMR or through the standard grievance procedure. Subdivision (d)(2) of that statute expressly states, “[i]n any case in which an enrollee or provider asserts that a decision to deny, modify, or delay health care services was based, in whole or in part, on consideration of medical necessity, the department shall have the final authority to determine whether the grievance is more properly resolved pursuant to an [IMR] or [as a standard grievance].”
DMHC cannot be directed to resolve all grievances raising issues of medical necessity and coverage under IMR. DMHC must exercise its discretion with respect to each grievance.

DISPOSITION

The judgment is reversed in part and modified to enjoin DMHC from upholding a plan’s denial of coverage for ABA services to be provided or supervised by a BACB-certified individual made on the basis that the provider is not licensed. This applies to all plans within DMHC’s jurisdiction, including plans exempted from the ABA statute. The judgment is otherwise affirmed. DMHC’s cross-appeal is dismissed as untimely. The parties shall bear their own costs on appeal.
Klein, P. J., concurred.

 There is an individual plaintiff in this case as well, Anshu Batra, M.D. As Dr. Batra’s arguments are not distinct from those made by Consumer Watchdog, references to Consumer Watchdog include Dr. Batra.

 Some BACB-certified providers are also licensed to practice medicine or psychology; there is no dispute that DMHC requires plans to cover therapy provided by such otherwise-licensed BACB-certified providers. Therefore, for the remainder of this opinion, when we refer to BACB-certified providers, we are referring to those BACB-certified providers who are not otherwise licensed to practice medicine or psychology.

 We discuss the independent medical review process later in this opinion.

 While DMHC argues the trial court’s result was correct, it does not adopt the court’s conclusion. DMHC does not suggest it could impose a licensure requirement that was not present in Knox-Keene or the MHPA. (Kaiser Foundation Health Plan, Inc. v. Zingale (2002) 99 Cal.App.4th 1018, 1024, 1027 [121 Cal.Rptr.2d 741].)

 The categories also include individuals with a bachelor’s degree and certain experience in ABA even without BACB certification. (Cal. Code Regs., tit. 17, § 54342, subd. (a)(12).)

 The ABA statute becomes inoperative on January 1, 2017, and, if not extended, is repealed as of such date. (Health & Saf. Code, § 1374.73, subd. (g).)

 Pursuant to Insurance Code section 12694.1, subscribers enrolled in the Healthy Families Program were to begin to transition to the Medi-Cal program no sooner than January 1, 2013, and the Healthy Families Program was to cease to enroll new subscribers no sooner than the date the transition begins. (Ins. Code, § 12694.1, subds. (a) & (f).) Welfare and Institutions Code section 14005.27 prescribes four phases for the State Department of Health Services to transition individuals from the Healthy Families Program to the Medi-Cal program. (See Welf. & Inst. Code, § 14005.27, subd. (e)(1).) Phase 4 of the transition was to begin no earlier than September 1, 2013. (Id., § 14005.27, subd. (e)(1)(D).) The parties have not advised this court of the current status of the transition.

 The concurring and dissenting opinion suggests we are refusing to address an important question “on the stated ground that the issue was not raised in the trial court by Consumer Watchdog.” (Conc. & dis. opn., post, at p. 885.) Respectfully, this mischaracterizes what we have stated. We are well aware and acknowledge that the proceedings below focused almost *879 exclusively on whether a professional license was required to legally administer ABA prior to enactment of the ABA statute. Indeed, it could have been no other way, as the ABA statute was enacted only after the case made its way to this court on appeal. Be that as it may, we have no mandate to decide what should have been done with grievances adjudicated before the ABA statute’s enactment because Consumer Watchdog did not seek relief for such grievances in the trial court.
Because the concurring and dissenting opinion focuses on whether the issue was raised below, it largely overlooks the impact that Consumer Watchdog’s limited request for relief has on the appropriate scope of our review. (Dimmick, supra, 58 Cal.2d at p. 423; Bach, supra, 215 Cal.App.3d at p. 306.) The concurring and dissenting opinion acknowledges “the complaint in no way sought retroactive relief (i.e., relief respecting grievances filed prior to June 30, 2009)” and “[t]here is nothing in the prayer seeking the reopening of already resolved grievances . . . .” (Cone. & dis. opn., post, at p. 887, fn. 6.) It nevertheless elects to adjudicate whether relief would have been available for such grievances (ultimately concluding no relief is available), due in large measure to the fact that this court raised the issue when we asked the parties to address whether the ABA statute mooted Consumer Watchdog’s appeal. (Conc. & dis. opn., post, at p. 889.) We agree, of course, that the parties litigated whether state licensure laws barred prospective coverage for ABA provided by BACB-certified therapists prior to enactment of the ABA statute. However, as the concurring and dissenting opinion recognizes, there was “no allegation that DMHC had a clear, present, and mandatory duty to reopen any wrongly resolved grievances.” (Conc. & dis. opn., post, at p. 887, fn. 6, italics added.) Because Consumer Watchdog is “preclude[d] . . . from asserting on appeal claims to relief not asserted in the trial court” (Dimmick, at p. 422), we have no cause to address such grievances.

 Our concurring and dissenting colleague agrees with this conclusion,- but argues we also should address whether BACB-certified therapists were engaged in the unlicensed practice of medicine prior to enactment of the ABA statute. We have no cause to address this issue in this case. Whatever applicability Business and Professions Code section 2052’s proscription against the unlicensed practice of medicine may have had prior to passage of the ABA statute, it is clear that after the ABA statute, BACB-certified therapists are “authorized to perform [ABA] pursuant to a certificate obtained in accordance with some other provision of law ....” (Bus. & Prof. Code, § 2052.) Indeed, DMHC acknowledges that the “[ABA statute] is that ‘other provision of law’ that provides an exemption [from] licensure requirements” for BACB-certified therapist providing ABA in this state. In light of the interests at stake, we see no reason to reach beyond the claims properly presented to arrive at a conclusion no party wishes to advance.

 Under California Rules of Court, rule 8.25(b)(1), a document is deemed filed on the date the clerk receives it. Thus, if the clerk timely received the notice of cross-appeal, even if it was not marked as filed until later, it would be considered timely filed.