Filed 8/31/20 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAFI GHAZARIAN et al., | |
| Plaintiffs and Appellants, | G057113 |
| v. | (Super. Ct. No. 30-2017-00909913) |
| MAGELLAN HEALTH, INC., et al., | ORDER MODIFYING OPINION, AND DENYING PETITIONS FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |

It is ordered that the opinion filed on August 7, 2020, be modified as follows:

1.  On page 10, first complete paragraph, delete first sentence and replace with the following sentences:

> A trial court's decision to consider or not consider evidence outside the separate statement is reviewed for an abuse of discretion. (*Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466, 1480-1481.) But when the trial court neither exercises nor declines to exercise that discretion, as is the case here, the appellate court has the same discretion as the trial court to consider evidence not cited in a party's separate statement. (*Id*. at p. 1481.) We exercise . . . .

2.  On page 13, first complete paragraph, fourth sentence, delete the word "Blue Shield" and replace with "an insurer."

3.  On page 13, first complete paragraph, fifth sentence, delete the word "an insurer's" and replace with "its."

4.  On page 13, second complete paragraph, delete second complete sentence and add the following sentence in its place:

Nothing in the current record indicates that occurred here.

5. On page 16, second complete paragraph, add footnote 8 with the following text, at the end of the paragraph:

In its petition for rehearing, Blue Shield argues that it should be given the opportunity to brief several of the issues set forth below under Government Code section 68081. Further briefing is unnecessary. The issues of fact identified below all relate to Blue Shield's reasonableness. As such, they were fairly included within the issues raised in the parties' briefs. (*Bledsoe v. Biggs Unified School Dist.* (2008) 170 Cal.App.4th 127, 141, fn. 11.) Among other things, Blue Shield argued "[t]he record contain[ed] no evidence of unreasonableness." It also stated that "[i]f the Court . . . were to look for supporting evidence [of Blue Shield's unreasonableness in the record], it would find nothing."

6. On page 25, second complete paragraph, delete second sentence, and replace with the following sentences:

The scope of this argument is unclear. To the extent Blue Shield contends plaintiff cannot seek public injunctive relief without following class action procedures, this argument was rejected by our Supreme Court. In *McGill* . . . .

7. On page 25, second complete paragraph, at the end of the paragraph, add the following sentence:

To clarify, we make no finding as to whether plaintiffs have actually set forth a claim for public injunctive relief.

8. On page 25, after second complete paragraph, add the following paragraph:

Further, there are triable issues of fact as to whether plaintiffs seek "broad, class-type injunctive relief." The complaint alleges "plaintiffs *can* comply with Section 382 of the Code of Civil Procedure and the standing requirements of Section 17204 of the Business and Professions Code." (Italics added.) But the complaint does not definitively state that plaintiffs are seeking broad injunctive relief requiring class action procedures. Instead, plaintiffs only allege they "are entitled to restitution and injunctive relief" under the UCL. Similarly, their prayer seeks "injunctive relief to enjoin the conduct of Defendants." And in their reply brief, plaintiffs contend they can seek individual injunctive relief under the UCL. Blue

2

Shield provides no evidence, other than the complaint, that plaintiffs seek broad, class-type injunctive relief. Nor does Blue Shield argue that plaintiffs cannot obtain individual injunctive relief under the UCL. Given that there are questions of fact as the specific scope of injunctive relief sought by plaintiffs, summary adjudication of this issue is not warranted.

9. On page 26, after second complete paragraph, add the following paragraph:

In its petition for rehearing, Magellan argues that summary adjudication of plaintiffs' request for punitive damages is warranted because the only remaining claim asserted against it is the UCL claim, and punitive damages are unavailable under the UCL. Plaintiffs filed a non-opposition in response to Magellan's petition. Magellan is correct. A UCL claim cannot serve as the basis for punitive damages. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1147-1148.) And this opinion should not be read to depart from this well-established rule. Nonetheless, Magellan did not make this argument to the trial court or in its respondent's brief. Generally, "[a]rguments cannot be raised for the first time in a petition for rehearing." (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 746.) As such, we will not address this new argument. This opinion, however, does not prevent the trial court from ruling on this issue if properly raised by Magellan.

This modification does not change the judgment. The petitions for rehearing are DENIED.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAFI GHAZARIAN et al., | |
| Plaintiffs and Appellants, | G057113 |
| v. | (Super. Ct. No. 30-2017-00909913) |
| MAGELLAN HEALTH, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeals from judgments of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Reversed and remanded as directed.

The Arkin Law Firm and Sharon J. Arkin; Law Office of Randy D. Curry and Randy David Curry for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza and Cassidy C. Davenport for Defendants and Respondents Magellan Health, Inc., and Human Affairs International of California.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum, Justin Jones Rodriguez and Joseph E. Laska for Defendant and Respondent California Physicians' Service.

\*          \*          \*

Generally, an insurer is not liable for bad faith if its denial of a claim was reasonable. In this appeal, we clarify that to avoid bad faith liability, it is not enough that an insurer's ultimate decision might be considered reasonable at first glance. Here, the trial court erred by failing to look past an arguably reasonable denial to determine whether the insurer fairly evaluated its insured's claim.

Plaintiffs Rafi Ghazarian and Edna Betgovargez (collectively plaintiffs) have a son, A.G., with autism. A.G. receives applied behavior analysis (ABA) therapy for his autism under a health insurance policy (the policy) plaintiffs have with defendant California Physicians' Service dba Blue Shield of California (Blue Shield). Mental health benefits under this policy are administered by defendants Magellan Health, Inc. and Human Affairs International of California (collectively Magellan). By law, the policy must provide A.G. with all medically necessary ABA therapy. (Health & Saf. Code, § 1374.73, subds. (a)(1) & (c)(1).)[1]

Before A.G. turned seven years old, Blue Shield and Magellan (collectively defendants) had approved him for 157 hours of medically necessary ABA therapy per month. But shortly after he turned seven, defendants denied plaintiffs' request for 157 hours of therapy on grounds only 81 hours per month were medically necessary. Plaintiffs requested the Department of Managed Health Care (the Department) conduct an independent review of the denial. (§ 1374.30 et seq.) Two of the three independent physician reviewers disagreed with the denial, while the other agreed. As a result, the Department ordered Blue Shield to reverse the denial and authorize the requested care.

Plaintiffs then filed this lawsuit against defendants. They asserted a claim for breach of the implied covenant of good faith and fair dealing against Blue Shield, and they also asserted claims for intentional interference with contract and violations of Business and Professions Code section 17200 (the UCL) against defendants. Primarily,

---

[1] Further undesignated statutory references are to the Health and Safety Code.

2

plaintiffs allege defendants have adopted unfair medical necessity guidelines that categorically reduce the amount of ABA therapy autistic children receive once they turn seven years old, regardless of medical need.

Defendants each moved for summary judgment. Both motions were granted. As to the bad faith claim, the trial court found that since one of the independent physicians agreed with the denial, Blue Shield acted reasonably as a matter of law. As to the intentional interference with contract claim, the court found no contract existed between plaintiffs and A.G.'s treatment provider with which defendants could interfere. Finally, the court found the UCL claim was based on the same allegations as the other claims and thus also failed. Separate judgments were entered in favor of defendants. Plaintiffs now appeal.

We find summary judgment was improperly granted as to the bad faith and UCL claims. Superficially, defendants' denial of the treatment might appear to be reasonable since an independent physician agreed with their decision. But it is well established that an insurer may be liable for bad faith if it unfairly evaluates a claim. Here, there are factual disputes as to the fairness of defendants' evaluation. In particular, the medical necessity standards defendants used to deny plaintiffs' claim appear to arbitrarily reduce ABA therapy for children once they turn seven. There are questions of fact as to the reasonability of these standards. If defendants used unfair criteria to evaluate plaintiffs' claim, they did not fairly evaluate it and may be liable for bad faith.

Further, had the trial court examined why the independent physician found A.G.'s treatment should be reduced, other questions of fact about whether defendants' denial was reasonable would have been obvious and also would have required denial of the motion. The independent physician found treatment should be reduced because A.G. was not making much progress with ABA therapy. In contrast, Blue Shield stated A.G. did not need as much treatment because he had already made significant progress under ABA therapy. There are also questions of fact as to whether defendants thoroughly

3

evaluated supporting documentation for the claim and pressured A.G.'s therapy provider to adopt their allegedly unreasonable criteria.

Conversely, we find summary adjudication proper as to the intentional interference with contract claim because plaintiffs have failed to show any contract with which defendants interfered.

We reverse the judgments and remand the case to the trial court as directed.

I
FACTS

*A. Background Law*

Under the Mental Health Parity Act enacted in 1999 (section 1374.72), "every health plan providing hospital, medical or surgical coverage must also 'provide coverage for the diagnosis and *medically necessary treatment* of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child' as specified in the statute. [(Citing § 1374.72, subd. (a).)] The statute specifically itemizes the '"severe mental illnesses"' that must be covered, including '[p]ervasive developmental disorder or autism.' [(Citing § 1374.72, subd. (d)(7).)]"[2] (*Consumer Watchdog v. Department of Managed Health Care* (2014) 225 Cal.App.4th 862, 870 (*Consumer Watchdog*).)

In 2011, the Legislature further addressed autism treatment by enacting section 1374.73. This statute specifically requires health plans subject to section 1374.72

---

[2] "'"[A]utism spectrum disorders are complex neurological disorders of development that onset in early childhood." [Citation.] These disorders, which include full spectrum autism, "affect the functioning of the brain to cause mild to severe difficulties, including language delays, communication problems, limited social skills, and repetitive and other unusual behaviors."'" (*Consumer Watchdog*, *supra*, 225 Cal.App.4th at p. 868.)

4

to also provide coverage for medically necessary ABA therapy.[3] (§ 1374.73, subds. (a)(1) & (c)(1); *Consumer Watchdog*, *supra*, 225 Cal.App.4th at pp. 874-875.) ABA therapy "is a form of behavioral health treatment which develops or restores, to the maximum extent practicable, the functioning of an individual with autism. [Citation.] Numerous studies indicate that ABA is the most effective treatment known for autistic children. Studies also demonstrate that ABA has lasting results. . . . ABA therapy can create new brain connections in a child with autism; these new connections are to be contrasted with the abnormal connections caused by autism." (*Consumer Watchdog*, *supra*, 225 Cal.App.4th at p. 868.)

The Department "is entrusted with the protection of patients' rights to quality health care, including enforcement of laws relating to health care service plans." (*California Consumer Health Care Council, Inc. v. Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 687-688.) These responsibilities include handling the grievances of patients whose claims have been denied by their insurers for lack of medical necessity. (*Consumer Watchdog*, *supra*, 225 Cal.App.4th at p. 871.) Such patients may request the Department conduct an independent medical review (IMR) of their denied claims. (*Ibid.*; § 1374.30, subds. (a), (b) & (d).) In the IMR process, "an independent medical reviewer (or reviewers) determines whether the disputed health care service is medically necessary based on the specific needs of the patient and such information as peer-reviewed scientific evidence, nationally recognized professional standards, and generally accepted standards of medical practice. . . . If the IMR decision is in favor of the patient, the plan shall either promptly authorize the services or

___

[3] Section 1374.73, subdivision (d), exempts certain health plans from its requirements: "(1) [a] specialized health care service plan that does not deliver mental health or behavioral health services to enrollees"; and "(2) [a] health care service plan contract in the Medi-Cal program . . . ." Neither of these exemptions are relevant here.

5

reimburse the provider or the enrollee for services already rendered." (*Consumer Watchdog*, *supra*, 225 Cal.App.4th at p. 871.)

B. *Denial of Plaintiffs' Claim*

Plaintiffs' son, A.G., was born in April 2009 and later diagnosed with autism. A.G. began receiving ABA therapy from the Center for Autism Related Disorders (CARD) in 2012, which was covered by Blue Shield under the policy. Mental health benefits under the policy were arranged and administered by Human Affairs International of California (Human Affairs) under a contract it had with Blue Shield. Human Affairs is a wholly owned subsidiary of nonparty Magellan Healthcare, Inc., which is a wholly owned subsidiary of defendant Magellan Health, Inc. (MHI).[4] There is no dispute that the policy was subject to section 1374.73 or that Blue Shield was legally required to cover all of A.G.'s medically necessary ABA therapy.

Prior to May 2016, i.e., before A.G. turned seven years old, Blue Shield had covered 157 total hours of medically necessary ABA treatment per month (roughly 36 hours per week). This amount was comprised of 137 hours of direct one-on-one services, 14 hours of supervision, and 6 hours of caregiver training. Shortly after A.G. turned seven, plaintiffs received a letter dated May 2, 2016, from Magellan acting as Blue Shield's mental health service administrator.[5] In the letter, Magellan denied plaintiffs' request for 157 hours of ABA treatment per month for the upcoming period between May 23 to November 23, 2016. Instead, Magellan approved only 81 total hours per month

---

[4] MHI contends it cannot be held liable for the acts of Human Affairs. As explained in part E, *infra*, based on the record, there is no practical distinction between the conduct of Human Affairs and MHI for purposes of this appeal. So, we generally refer to these parties collectively throughout this opinion.

[5] The letter is on Blue Shield letterhead but specifies it is coming from "the mental health service administrator (MHSA) for Blue Shield," which is Magellan.

(roughly 19 hours a week), including 68 hours of direct one-on-one services, 7 hours of supervision, and 6 hours of caregiver training. The letter explained that A.G. had made significant progress under ABA therapy. Consequently, the remaining 76 hours were not medically necessary under Magellan's medical necessity criteria and thus denied. The letter was signed by Dr. Gayani DeSilva, an associate medical director for Magellan.

Plaintiffs appealed Magellan's decision to Blue Shield. Blue Shield denied the appeal in a letter dated June 15, 2016, stating "the medical necessity of this total number of hours per month of direct and supervisory ABA services has not been established." The letter was signed by Blue Shield's medical director.

Following Blue Shield's denial of their appeal, plaintiffs requested an IMR from the Department. Their petition was reviewed by a panel of three independent, board-certified physicians. Two of the three panel members found the requested 157 monthly hours of ABA treatment to be medically necessary. The other panel member agreed with Blue Shield that only 81 monthly hours were medically necessary. Contrary to Blue Shield, however, the physician found less ABA treatment was warranted because A.G. had made limited improvements over the years, "suggesting that he has had minimal response to ABA therapy." The Department sent plaintiffs a letter dated July 12, 2016, stating Blue Shield's denial had been overturned based on the majority opinion of the panel. The Department ordered Blue Shield to authorize the requested treatment within five working days. Blue Shield complied.

## C. The Instant Lawsuit

Plaintiffs filed this lawsuit against Blue Shield and MHI in March 2017. They filed the operative first amended complaint in June 2017 and later amended it to designate Human Affairs as Doe 1. Among other things, plaintiffs alleged defendants had engaged in the following conduct: (1) adopted unreasonable medical necessity standards that indiscriminately reduce the amount of authorized ABA treatment for

7

autistic children once they turn seven years old; (2) bullied ABA therapy providers into adopting these unreasonable standards by threatening to terminate provider agreements; (3) forced families to file IMR requests with the Department to obtain medically necessary ABA treatment; and (4) failed to thoroughly investigate ABA treatment claims prior to denial.

Based on these allegations, the amended complaint asserted causes of action for breach of the implied covenant of good faith and fair dealing, intentional interference with contractual relations, and UCL violations. The breach of the implied covenant claim was asserted against Blue Shield only, while the remaining claims were asserted against all defendants.

In January 2018, defendants filed separate motions for summary judgment, or, in the alternative, summary adjudication of the individual claims alleged against them. The trial court granted both summary judgment motions in September 2018. As to the first cause of action, the trial court found "Blue Shield's conduct was reasonable as a matter of law. . . . Blue Shield presented undisputed evidence that [the Department] conducted an [IMR] utilizing three independent physicians at Plaintiffs' request. One such physician agreed with Blue Shield's coverage determination." As to the second cause of action, the trial court found no contract existed between plaintiffs and CARD with which defendants could interfere. Finally, the trial court found the UCL claim arose from the same allegations as the other two claims, and, consequently, failed for the same reasons.

The trial court entered separate judgments in favor of defendants in October 2018. Plaintiffs appeal.

DISCUSSION

## A. Legal Standard

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A defendant moving for summary judgment must show the plaintiff's causes of action have no merit. It may do so by negating an element of a cause of action or showing it has a complete defense to a cause of action. The burden then shifts to the plaintiff to show a triable issue of material fact as to the cause of action or defense. (*Id*. at p. 849.)

The trial court's decision is reviewed de novo, "considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained." (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65-66.) The reviewing court "liberally constru[es] the evidence in favor of the party opposing the motion and resolv[es] all doubts about the evidence in favor of the opponent." (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 732-733.) Similarly, "any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)

## B. Evidence Outside the Separate Statement

Before analyzing the merits of the appeal, we address Blue Shield's contention that plaintiffs cannot rely on facts outside their separate statement. In *San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal.App.4th 308, 315-316, this court found that "[w]hether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court . . . ." The trial court

9

likewise has discretion to consider facts not referenced in the opposing party's separate statement. (Code Civ. Proc., § 437c, subd. (b)(3); see *San Diego Watercrafts, Inc.*, at pp. 315-316.)

The appellate court has the same discretion as the trial court to consider evidence not cited in a party's separate statement. (*Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466, 1481.) We exercise that discretion here. The record in this case is not large, and there are only a few key documents. In fact, plaintiffs submitted only about 60 pages of evidence in opposition to the motions. We also note that "[t]he separate statement is not designed to pervert the truth, but merely to expedite and clarify the germane facts." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 438.)

## C. Defendants' Evidentiary Objections

Defendants each made several objections to plaintiffs' evidence. The trial court did not rule on any of them. Thus, we presume the trial court overruled these objections and considered the disputed evidence in ruling on the motions. (*Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 534.) The overruled objections may be raised on appeal, but the burden is on the objecting party to renew any relevant objection by arguing the issue in its brief; citation to the record alone is insufficient. (*Ibid.*; *Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 251, fn. 17.) Magellan did not renew any of its evidentiary objections on appeal, and, as a result, we disregard them. We will address Blue Shield's renewed objections below where relevant.

## D. Breach of the Implied Covenant of Good Faith and Fair Dealing

### 1. Bad faith liability

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's

10

benefits. . . . When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.'" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).) Similarly, "'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.'" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.)

Bad faith may also be found where an insurer "employs a standard of medical necessity significantly at variance with the medical standards of the community . . . . Such a restricted definition of medical necessity, frustrating the justified expectations of the insured, is inconsistent with the liberal construction of policy language required by the duty of good faith. . . . [G]ood faith demands a construction of medical necessity consistent with community medical standards that will minimize the patient's uncertainty of coverage in accepting his physician's recommended treatment." (*Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 845-846 (*Hughes*).)

In *Hughes*, the plaintiff's son was hospitalized several times for psychiatric reasons. The plaintiff's insurer denied a portion of her claims for hospital expenses on grounds some hospitalizations were not medically necessary. The plaintiff sued the insurer for bad faith and prevailed at trial. The insurer appealed, arguing the jury's verdict was not supported by substantial evidence. (*Hughes*, 215 Cal.App.3d at pp. 838-841.) The reviewing court disagreed, finding "the jury could reasonably infer that [the insurer's reviewing physician] employed a standard of medical necessity markedly at variance from that of the psychiatric community in California." (*Id.* at p. 843.) Among other things, the reviewing physician testified he recommended disapproval of about 30 percent of the claims he reviewed, was unswayed that his recommendation conflicted

11

with the son's other treating psychiatrists who were more familiar with the case, and admitted "his standard of medical necessity might be more restrictive than the generally accepted professional standard." (*Ibid*.)

The principles in *Hughes* are applicable here. Plaintiffs allege Blue Shield has adopted unreasonable medical necessity standards that indiscriminately reduce the amount of ABA therapy for children seven years old and above, regardless of medical need. The alleged scheme forces families to either accept Blue Shield's decision or expend additional resources going through the IMR process. In support of their allegations, plaintiffs provide Magellan's medical necessity guidelines for comprehensive ABA therapy, which were adopted by Blue Shield.[6] These guidelines state, "[ABA] Services may range from 21 to 40 hours per week, *early in the recipient's development (for example, under the age of 7)*. . . . The standard of care for comprehensive services has been for durations of 1 to 2 years." (Italics added.)

Plaintiffs assert these guidelines conflict with established medical standards. Specifically, the standards set forth by the Behavior Analyst Certification Board (BACB), which state, "[ABA] treatment should be based on the clinical *needs of the individual and not constrained by age*. . . . ABA is effective across the life span. Research has not established an age limit beyond which ABA is ineffective." (Italics added.) The BACB is "a private organization established [in 1998] to grant national credentials to ABA professionals." (*Consumer Watchdog*, *supra*, 225 Cal.App.4th at p. 869.) It is a respected organization in the world of ABA treatment. This is evidenced by section 1374.73, subdivision (c)(3)(A), which defines "'[q]ualified autism service provider'" to mean "[a] person who is certified by a national entity, such as the Behavior Analyst Certification Board . . . ."

---

[6] Blue Shield does not argue that it cannot be held liable for the actions of Magellan, its mental health service administrator.

12

While the BACB's guidelines are not binding on Blue Shield, they are evidence of the general standard of medical necessity for ABA therapy. Notably, the BACB's guidelines state treatment should be based on the needs of the individual and unconstrained by age. In comparison, Blue Shield's standards appear to arbitrarily limit comprehensive ABA therapy (21 to 40 hours per week) to children under the age of seven, or, at best, to "early in the recipient's development." Though Blue Shield may develop its own standards for determining medical necessity (see § 1367.01, subd. (b)), it may not adopt self-serving guidelines that lack support from the medical community. Such actions are inconsistent with an insurer's obligations under the implied covenant of good faith and fair dealing. (*Hughes*, *supra*, 215 Cal.App.3d at pp. 845-846.)

To be clear, we do not mean to suggest that a health insurer cannot define medical necessity in a manner that embraces efficient practices or novel technologies or procedures that have support in the medical community. That is not the case here. Blue Shield provides no explanation or evidence in support of the reasonableness of the medical necessity guidelines at issue. It is entirely unclear why Blue Shield's standards advise that comprehensive ABA therapy should be limited to children under the age of seven. Here, A.G.'s ABA therapy was reduced from roughly 36 hours per week to 19 hours per week just after he turned seven years old. Based on the record, triable issues of fact exist as to the reasonableness of Blue Shield's medical necessity standards for comprehensive ABA therapy and whether plaintiffs' claim was unfairly denied based on those standards.

### 2. *The genuine dispute rule*

Blue Shield argues the trial court correctly granted summary judgment under the genuine dispute rule (also known as the genuine issue rule). We disagree.

The genuine dispute rule allows an insurer to avoid bad faith liability by showing it denied payment on a claim due to the existence of a genuine dispute with its

insured over coverage or the claim amount. (*Wilson*, *supra*, 42 Cal.4th at p. 723.) "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Id.* at pp. 723-724.) "An insurer cannot claim the benefit of the genuine dispute doctrine based on an investigation or evaluation of the insured's claim that is not full, fair and thorough." (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1237.)

"When determining if a dispute is genuine, we do 'not decide which party is "right" as to the disputed matter, but only that a reasonable and legitimate dispute actually existed.' [Citation.] A dispute is legitimate, if 'it is founded on a basis that is *reasonable under all the circumstances*.' [Citation.] 'This is an *objective* standard.' [Citation.] 'Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors.'" (*Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1028, first italics added (*Zubillaga*).)

A trial court may grant summary judgment based on the genuine dispute rule "'when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues [citation] as to whether the disputed position upon which the insurer denied the claim was

14

*reached reasonably and in good faith*." (*Wilson*, *supra*, 42 Cal.4th at pp. 723-724, italics added.)

The reasonableness of an insurer's conduct is typically a question of fact but can be decided as a matter "of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346; *Fadeeff v. State Farm General Ins. Co.* (2020) 50 Cal.App.5th 94, 102 ["Ordinarily, reasonableness is a factual issue to be decided by a jury"].)

Blue Shield's argument focuses on the one physician on the IMR panel that agreed with its decision. There is no evidence challenging the reasonability of this physician's conclusion. So, Blue Shield contends that because an independent physician agreed with its denial, there is a genuine dispute as to whether 157 monthly hours of ABA treatment were medically necessary. However, for the genuine dispute rule to apply, Blue Shield's denial must be "'founded on a basis that is reasonable under all the circumstances.'" (*Zubillaga*, *supra*, 12 Cal.App.5th at p. 1028.) The undisputed record must show Blue Shield fairly and thoroughly evaluated plaintiffs' claim and its denial "was reached reasonably and in good faith." (*Wilson*, *supra*, 42 Cal.4th at pp. 723-724; *Bosetti v. United States Life Ins. Co. in City of New York*, *supra*, 175 Cal.App.4th at pp. 1237-1238.)

The record does not show this. As set forth above, there are triable issues as to the reasonableness of Blue Shield's medical necessity guidelines. In other words, there are questions of fact as to whether Blue Shield fairly evaluated plaintiffs' claim and reached its denial reasonably and in good faith. Plaintiffs' claim was not fairly evaluated if Blue Shield denied it based on unfair criteria. Although one physician on the IMR panel arrived at the same conclusion as Blue Shield, that physician did not apply or evaluate Blue Shield's medical necessity criteria. As such, this evidence does not show that Blue Shield acted reasonably as a matter of law.

15

To further illustrate, viewing the facts most favorably to plaintiffs, Blue Shield arbitrarily reduces ABA treatment for autistic children after they turn seven years old.  Based on this criteria, Blue Shield reduced A.G.'s treatment from 157 hours to 81 hours per month after he turned seven without regard for his actual medical needs.  It then cited A.G.'s significant progress—progress the expert it now wishes to rely on said did not exist—as a pretextual reason for this reduction.  Under this version of the facts, even if there is a genuine dispute as to the amount of treatment that is medically necessary for A.G., that dispute is immaterial because the claim was not fairly evaluated.[7] Blue Shield did not reach this decision reasonably and in good faith.  A health insurer is not absolved of bad faith liability if it bumbles into a facially reasonable medical decision using patently unfair medical necessity criteria.  Even a stopped clock is right twice a day.

Blue Shield cannot defeat plaintiffs' bad faith claim at summary judgment by only showing a reasonable dispute exists as to its ultimate decision.  To be granted summary judgment in this case, the undisputed record must show that Blue Shield's medical necessity guidelines are consistent with community medical standards.  (See *Hughes*, *supra*, 215 Cal.App.3d at pp. 845-846.)  It does not.  Issues of fact remain as to whether Blue Shield has adopted unreasonable medical criteria for comprehensive ABA therapy.  Besides, there are other issues of fact as to whether Blue Shield fairly evaluated plaintiffs' claim.

First, Magellan's separate statement cited evidence indicating it did not review CARD's report on A.G. prior to denying plaintiffs' claim.  Specifically, Magellan cited deposition testimony from plaintiff Betgovargez describing a call she had with a

_____

[7] We provide no opinion on whether a genuine dispute actually exists as to the amount of medically necessary ABA treatment that A.G. requires.  This is not material to our analysis.

16

CARD representative. Betgovargez testified that the CARD representative "met with Dr. DeSilva . . . from Magellan, and [Dr. DeSilva] basically verbally told her that she wasn't going to approve the hours. And when she asked [Dr. DeSilva] why, she said -- she said, 'Well, have you even read his report?' [B]ecause she had turned in a big report. [Dr. DeSilva] said 'No.'"[8] A jury could find that by ignoring CARD's report, Magellan, acting on behalf of Blue Shield, unfairly evaluated plaintiffs' claim. (See, e.g., *Zubillaga*, *supra*, 12 Cal.App.5th at pp. 1029-1030 [summary judgment denied where insurer ignored physician's treatments and recommendations].)

Second, Blue Shield's stated reason for reducing A.G.'s treatment was at odds with the concurring physician on the IMR panel. Defendants explained reduced treatment was warranted because A.G. had already *significantly* improved with ABA therapy. In contrast, the physician on the IMR panel found less treatment was appropriate because A.G. had only shown *limited* improvement with ABA therapy, indicating it had only been minimally effective. The stark differences between these evaluations raise questions as to whether Blue Shield thoroughly and fairly evaluated plaintiffs' claim, especially in light of Betgovargez's deposition testimony above.

For example, Magellan's initial denial letter explained "[t]he clinical information from your provider has shown *measurable progress* has been made since you started ABA treatment with CARD on 5/14/12 and you no longer require 157 hours/month of ABA services. . . ." (Italics added.) It also stated, "[A.G.] has been receiving ABA treatment since May 2012 with CARD and has shown a *significant improvement* in behavior reduction goals, such that [he] no longer warrant[s] continuation of the 157 hours per month of ABA therapy." (Italics added.) Likewise, Blue Shield's denial of plaintiffs' appeal stated, "[t]he principal reason [for the denial] is the medical necessity of [the 157 hours of ABA treatment per month] has not been established.

---

[8] There were no objections to this evidence.

*Considering the improvement [A.G.] has made with his ABA therapy; . . .* a reduced allocation of service hours is sufficient in order to continue to train the social, communication, and self-control skills which [he] currently requires." (Italics added.)

On the other hand, the physician on the IMR panel that agreed with Blue Shield found "[t]he requested services are not medically necessary for treatment of the patient's medical condition. In this case, there is documentation supporting *limited behavioral improvements with ABA therapy.* His progress report notes positive *but limited behavioral improvement* after over four years of intensive ABA therapy, suggesting that he has had *minimal response to ABA therapy.* In this clinical setting, the Health Plan's authorization of [81 hours of therapy] is reasonable and medically appropriate." (Italics added.)

Third, there is evidence Blue Shield has engaged in a pattern of denying medically necessary ABA treatment. Plaintiffs filed the declaration of Mary Rizk in support of their opposition to both motions. Among other things, Rizk testified she has a seven-year-old daughter with autism who received comprehensive ABA therapy from CARD under a Blue Shield policy administered by Magellan. Blue Shield also denied ABA treatment for her daughter. Similar to plaintiffs, Rizk submitted multiple appeals through the IMR process, which resulted in the Department reversing Blue Shield's denials and ordering it to authorize the requested treatment. It could be inferred from this testimony that plaintiffs' experience was not unique. Rather, it was part of a larger pattern in which Blue Shield unfairly denied ABA treatment by adopting an unreasonable standard of medical necessity, forcing families to obtain necessary treatment through the IMR process.[9]

---

[9] Blue Shield objects to the entire Rizk declaration on relevancy grounds. It argues plaintiffs have not established Blue Shield's conduct was substantially similar in this case and the Rizk case. (See *Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 625.) "[T]o establish 'a pattern of unfair claims practices' the antecedent practice

Fourth, there are issues of fact as to whether Blue Shield, through Magellan, pressured CARD into adopting its unreasonable criteria. Such evidence would further demonstrate an overall pattern by Blue Shield to unfairly reduce ABA therapy to its insureds, including A.G. The record shows that in February 2017, Magellan gave notice to CARD that it was terminating their provider agreement without cause (the termination notice). Michelle Brennan-Cooke, a vice president of MHI, testified during deposition that she met with a CARD representative about CARD's performance a few months prior to the termination notice. During this meeting, Brennan-Cooke told the representative that CARD's "average billing far exceeded other agencies," and that CARD averaged a higher number of hours of treatment and "ha[d] more expensive case[s] in California than other ABA agencies." Magellan thought CARD had several children whose ABA services should be reduced or denied.

After receiving the termination notice, CARD asked Magellan to halt the termination. Brennan-Cooke opined this was likely because Magellan was "a big payer for [CARD]. They have a lot of Magellan members nationally." Then, in May 2017, Magellan and CARD entered into a letter agreement rescinding the termination. As part of the agreement, "CARD agree[d] to follow all of Magellan's Medical Necessary Criteria and clinical policies."

Brennan-Cooke's testimony shows Magellan thought CARD was providing too much treatment to its patients. This evidence, along with the timing of the termination notice and the terms of the letter agreement, creates a reasonable inference that Magellan threatened to terminate the provider agreement unless CARD adopted

must be substantially similar." (*Ibid*.) We liberally construe the evidence in favor of plaintiffs and resolve all doubts in their favor at summary judgment. (*Doe v. Department of Corrections & Rehabilitation*, *supra*, 43 Cal.App.5th at pp. 732-733.) Based on the current record, the facts in Rizk's declaration are similar enough to warrant admissibility for purposes of this appeal: Rizk's daughter is seven years old, was treated by CARD, was denied medically necessary ABA therapy by Blue Shield, and had the denials reversed through the IMR process.

Magellan's restrictive medical necessity guidelines. This inference is further supported by the Rizk and Ghazarian declarations. Rizk stated that CARD began reducing the amount of ABA hours for her daughter because it was afraid "it would lose its participating provider contract with Blue Shield and . . . Magellan." Ghazarian likewise averred that defendants "pressured CARD to reduce ABA claims, reduce appeals, and limit IMRs, at the risk of losing its participating provider agreement."[10]

*E. Liability of MHI*

MHI denies liability as to the remaining claims for intentional interference with contract and violation of the UCL, contending the undisputed evidence shows Human Affairs, its subsidiary, administered the policy. MHI maintains there is no evidence showing that it can be held liable for Human Affairs' actions. We disagree. There is sufficient evidence in the record to create issues of fact as to MHI's vicarious or direct liability.

First, the medical necessity guidelines at issue were developed by MHI. Brennan-Cooke testified to this during her deposition, and the guidelines state they are copyrighted by MHI. Similarly, in the letter agreement rescinding the termination of CARD's provider agreement, CARD agreed to follow "Magellan's Medical Necessary Criteria," with "Magellan" being defined to include MHI.

Second, there is evidence MHI was involved in the denial of plaintiffs' claim. The initial letter denying plaintiffs' claim was signed by Dr. DeSilva, who appears to have been employed by MHI.

---

[10] Blue Shield did not object to this portion of Ghazarian's declaration, and its only objection to this portion of the Rizk declaration was relevance. We find this evidence to be relevant and consider it in our analysis. (Code Civ. Proc., § 437c, subd. (b)(5); *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 956-957.)

Third, as set forth above, there are issues of fact as to whether MHI pressured CARD into adopting the medical necessity standards at issue. The termination notice was on MHI's letterhead. Brennan-Cooke, who met with CARD about its performance prior to the termination notice, was a vice president at MHI. Finally, MHI is a party to the letter agreement rescinding the termination.

### F. Intentional Interference with Contract

"The elements of a cause of action for intentional interference with contractual relations are '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 997.) "To state a claim for disruption of a contractual relation, the plaintiff need not show the defendant induced an actual or inevitable breach of the contract. It is sufficient to show the defendant's conduct made the plaintiff's performance, and inferentially enjoyment, under the contract more burdensome or costly." (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 51.)

In the trial court, plaintiffs argued they had a *written* contract with CARD with which defendants interfered. The trial court found no such contract existed and so the claim failed. On appeal, plaintiffs argue that defendants interfered with an *implied* contract that plaintiffs had with CARD. We will not consider this theory since it was presented for the first time on appeal and the existence of an implied contract is a question of fact, not law. (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847.)

Besides, this argument would fail even if considered. Though plaintiffs are vague on the specific terms of the implied contract, the gist of it seems to be that

plaintiffs would pay out of pocket for any treatment that defendants did not authorize. Plaintiffs allege defendants disrupted this contract by denying medically necessary ABA treatment for their son and pressuring CARD to adopt defendants' medical necessity guidelines. These actions resulted in actual disruption of the implied contract, they argue, because CARD reduced A.G.'s ABA therapy. But this assertion is belied by the undisputed record, which shows CARD never reduced A.G.'s treatment after defendants denied plaintiffs' claim.

More fundamentally, even if defendants improperly refused to cover medically necessary treatment, plaintiffs have not explained how this interfered with their ability to obtain additional therapy by paying out of pocket. Defendants' denial did not prevent plaintiffs from personally paying for uncovered treatment. To the contrary, the denial of treatment was the triggering condition for plaintiffs' obligation to personally pay CARD. Nor did the denial make plaintiffs' performance under the implied contract more burdensome or costly. Plaintiffs never had to perform. It is undisputed that Blue Shield provided the treatment, by order of the Department, before plaintiffs incurred any out-of-pocket expenses.

## G. UCL Claim

Defendants each made several arguments as to plaintiffs' UCL claim. We are not persuaded by any of them and conclude that summary judgment was wrongly granted as to this claim.

### 1. Unfair competition

Both defendants contend that plaintiffs have failed to establish "unfair competition" under the UCL. Not so. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) "[B]ad faith

22

insurance practices may qualify as any of the three statutory forms of unfair competition." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 380.)

Since plaintiffs' bad faith claim against Blue Shield survives summary judgment, its UCL claim against Blue Shield must too. Although no bad faith claim was asserted against Magellan, it is inextricably intertwined with the conduct underlying the bad faith claim: (1) it created the medical necessity guidelines at issue in this case; (2) it initially denied plaintiffs' claim while acting as Blue Shield's mental health service administrator; and (3) it pressured CARD into adopting its medical necessity guidelines. Therefore, the UCL claim against Magellan must also survive.

### 2. Standing

Next, Magellan claims that plaintiffs lack standing. This argument is unconvincing. Under the UCL, "private standing is limited to any 'person who has suffered injury in fact and has lost money or property' as a result of unfair competition." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788.) The purpose of this rule is "to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of '"clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . ."'" (*Ibid.*) "There are innumerable ways in which economic injury from unfair competition may be shown." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323.) A party has standing when they have "expended money due to the defendant's acts of unfair competition." (*Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 854.) For example, a "plaintiff may . . . be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." (*Kwikset Corp.*, at p. 323.)

Due to the wrongful denial of their insurance claim, plaintiffs retained and paid an attorney to assist them with the IMR process. This is sufficient to establish

standing under the UCL.  Plaintiffs hired an attorney because of defendants' denial of their claim.  The transaction would have been unnecessary without defendants' conduct.

Magellan contests standing by baselessly accusing Ghazarian of filing a "sham declaration [that] fatally contradicts his deposition testimony."  It cites a portion of Ghazarian's declaration that states "'[i]n order to appeal effectively, and to file an effective IMR, [plaintiffs] retained and paid an attorney for this process . . . .'"  Magellan then contends "at deposition, which was prior to the signing of [Ghazarian's] declaration . . . [Ghazarian] unequivocally testified that he prepared the IMR himself.  [Citation.]  This testimony belies [Ghazarian's] claim that he paid an attorney to assist him in the IMR process."

At the outset, the fact that Ghazarian drafted the IMR petition himself does not preclude him from retaining an attorney to assist with the process.  These are not mutually exclusive actions.  More troubling, however, is that the very portion of the deposition transcript on which Magellan relies reveals this argument lacks merit:

"Q:  Okay. Did your attorney -- was your – were you already working with an attorney by the time of the I.M.R.?

"A:  *I believe I had contacted [my current counsel] by then, yes.*

"Q:  Okay. Did you prepare the I.M.R. yourself?

"A:   Yes."  (Italics added.)

Magellan cites the final two lines of this exchange but curiously ignores the preceding question.

Similarly, other portions of the transcript from Ghazarian's deposition show that he retained his current counsel, Randy Curry, after Blue Shield denied his appeal and prior to the IMR.  Ghazarian testified that after he received the June 15, 2016 denial letter from Blue Shield, "one of the things I did at the time was reach out to [Mr. Curry] . . . . [¶]  . . . [¶]  . . . Ultimately [plaintiffs] decided to do an I.M.R.  [¶]  As well as I think, [Mr. Curry], you also prepped a letter for us as part of this."

### 3. Injunctive Relief

Blue Shield also argues the UCL claim should be dismissed because plaintiffs have an adequate remedy at law, specifically, money damages. In response, plaintiffs state they seek injunctive relief, and they insist the adequate-remedy-at-law requirement does not apply to injunctions sought under the UCL. We need not address the latter component of plaintiffs' argument. There are issues of fact as to whether plaintiffs have an adequate remedy at law. As explained above, there are triable issues as to whether defendants unfairly denied plaintiffs claim by using unreasonable medical necessity guidelines. There is no evidence these guidelines have been changed. If the guidelines are found to be unreasonable, damages may be inadequate. They would not protect plaintiffs from future wrongful denials of benefits.

Blue Shield further contends plaintiffs may not seek broad injunctive relief under the UCL without filing a class action, which they did not do. This argument was rejected by our Supreme Court. In *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, the Court held that a plaintiff bringing a private action for public injunctive relief need not comply with class action requirements. (*Id*. at pp. 959-960.) As explained in *McGill*, "'an injunction' is 'the primary form of relief available under the UCL to protect consumers from unfair business practices.'" (*Id*. at p. 959.) Among other things, a class action requirement "would largely eliminate the ability of a private plaintiff to pursue such relief, because class certification requires 'the existence of both an ascertainable class and a well-defined community of interest among the class members' [citation], and '"the general public . . ." fails to meet' this requirement . . . ." (*Id*. at p. 960.)

## H. Punitive Damages

Since the trial court granted summary judgment, it did not rule on Magellan's request for summary adjudication of plaintiffs' claim for punitive damages. Magellan renews this request on appeal. We deny it, finding issues of fact exist.

25

Plaintiffs may recover punitive damages if they can show by clear and convincing evidence that Magellan "has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).)  "Malice" is defined as conduct intended "to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (Civ. Code, § 3294, subd. (c)(2).)  Finally, "'[f]raud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  (Civ. Code, § 3294, subd. (c)(3).)

Based on the evidence set forth above, we cannot find as a matter of law that plaintiffs are barred from obtaining punitive damages against Magellan.  A jury must determine whether there is clear and convincing evidence that Magellan acted maliciously, oppressively, or fraudulently under Civil Code section 3294.

### III

### DISPOSITION

The judgments in favor of defendants are both reversed.  On remand, the trial court is directed to grant summary adjudication in favor of defendants as to plaintiffs' cause of action for intentional interference with contract and to deny summary adjudication as to the other claims.  Plaintiffs are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.