Filed 11/27/24  In re I.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re I.S., a Person Coming Under the Juvenile Court Law. | D083898 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J518904) |
| Plaintiff and Respondent, | |
| v. | |
| I.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Affirmed.

Neale B. Gold, under appointment of the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

I.S. (Minor) is a dependent of the court with a permanent plan of long-term foster care.[1] Minor appeals a postpermanency review order where the juvenile court found the services provided by San Diego Health and Human Services Agency (Agency) were generally adequate and reasonable, but the court set a special hearing to receive updates regarding specific services about which the court remained concerned. Minor contends substantial evidence did not support the juvenile court's findings of adequate services because the Agency did not timely provide applied behavior analysis (ABA) services,[2] trauma therapy, or gender affirming services. Minor also contends her rights to equal protection under the law were violated because a transgender youth with a permanent foster care plan cannot access adequate gender affirming services.

The Agency contends the matter is not justiciable. It asserts Minor does not have standing as an aggrieved party since Welfare and Institutions Code[3] section 366.3 does not provide a remedy for failure to provide adequate services. Further, the issues about which Minor complains are moot since

---

[1]    Appellant asked to be referred to by different names during these proceedings. Since issuing our last opinion, Minor expressed a preference to use she/her/hers pronouns. Accordingly, we refer to appellant as Minor and her preferred gender pronouns.

[2]    ABA therapy is an element of Minor's care plan. ABA is a time-intensive form of therapy used to effectively treat children with symptoms of autism. It is often prescribed for 26 to 40 hours per week with a treatment team supervised by a qualified expert in ABA. ABA therapy can be performed by a licensed physician or psychologist. (*Consumer Watchdog v. Department of Managed Health Care* (2014) 225 Cal.App.4th 862, 867–868.)

[3]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

she received ABA services, therapy, and gender affirming care after she filed her appeal.  Alternatively, the Agency contends substantial evidence supports the juvenile court's finding of adequate services in the postpermanency period.

We conclude the matter is justiciable.  Because we are required to construe questions about standing liberally, we conclude Minor has standing to challenge the order.  We decline to determine whether the issues on appeal are moot based on postappeal evidence.

Turning to the merits, we conclude substantial evidence supported the juvenile court's finding that the Agency generally provided adequate assistance to Minor during the review period, but the evidence also supported the court's concern about the progress of providing certain services.  Based on its concerns that certain services identified in Minor's care plan were not yet fully implemented, the juvenile court properly exercised its discretion by ordering a special hearing to monitor the progress of providing ABA services, trauma therapy, gender affirming care, and gender sensitivity training.  We further conclude Minor has not established that section 366.3, subdivision (e) violates her right to equal protection because the record does not establish that difficulty in obtaining services was based on her gender identity.  We, therefore, affirm the order.

## II.  BACKGROUND

A.    *Prior Dependency Matters*

The first time we reviewed this case was shortly after L.S. (Mother) gave birth to Minor in 2014. The Agency filed a dependency petition because it was concerned Mother could not provide regular care to Minor due to Mother's developmental disability.  Mother completed her case plan and successfully reunified with Minor.

3

Alleging Mother lacked adequate supervision skills, the Agency filed a second dependency action in 2018, after Minor presented with unexplained lacerations on her body. The court again returned Minor to Mother's custody at the disposition hearing and terminated jurisdiction.

B.     *Prior Appeals*

The second case we reviewed started shortly after the trial court terminated jurisdiction in the 2018 proceedings. The Agency received reports that Mother slapped, hit, shoved, and yelled at Minor. Mother denied the allegations but admitted she screamed loudly at Minor.

Then in January 2020, Minor, five years old at the time, told a teacher that Mother struck her with a rope, later determined to be a vacuum cord. Minor's legs showed bruising consistent with physical abuse. Minor was detained in protective custody at Polinsky Children's Center (PCC), an emergency shelter for children. Minor also disclosed prior abuse, saying she did not report the abuse earlier because she "pinky promised" and "didn't want to go to foster care again."

The Agency filed the petition commencing this action alleging Minor was a child described by section 300, subdivision (a) who was at risk of suffering serious physical harm inflicted nonaccidentally by Mother. Minor was placed in a foster home in March 2020.

At the contested jurisdiction and disposition hearing in September 2020, the juvenile court found the Agency made a prima facie showing that Minor was a child described by section 300, subdivision (a). The court ordered Minor detained out of the home and directed the Agency to provide services. Mother appealed the juvenile court's removal order. We affirmed the order in an unpublished opinion. (*In re I.S.* (Jan. 26, 2021, D077949) [nonpub. opn.].)

4

One of the on-going challenges for Mother and the Agency is that Minor has a history of disruptive behaviors related to autism and difficulty with self-regulation. For instance, when transitioning to non-preferred tasks, she would throw herself to the ground, kick, and cry. In April 2020, an Agency social worker discussed obtaining ABA services and other intense behavior correction support to help Mother enhance her parenting skills and avoid future abuse. The Agency asked if Mother and Minor could participate in such services through the San Diego Regional Center (Regional Center).[4]

Minor began participating in Foster Family Agency Stabilization Treatment (FFAST),[5] working primarily on safety and behavioral issues, including self-regulation. The FFAST therapist looked forward to Minor starting ABA services so they could focus during therapy on past trauma and posttraumatic stress disorder. The caregiver reported that Minor's behavioral issues improved with therapy. Unfortunately, Minor's caregiver was unable to transport Minor to, or participate in, an ABA assessment.

At a combined six- and 12-month review hearing in April 2021, the juvenile court determined there was a substantial risk of detriment to Minor

---

[4]     The Regional Center is a nonprofit agency, funded and regulated by the state, which helps persons diagnosed with developmental disabilities. (See *People v. Cuevas* (2013) 213 Cal.App.4th 94, 104, fn. 9.) Both Mother and Minor were clients of the Regional Center, based on Mother's mild developmental disability and Minor's autism.

[5]     FFAST is a group of programs provided by the San Diego Center for Children. FFAST "is the sole provider contracted with the County of San Diego Behavioral Health Services to provide therapy and other supportive services to youth, ages 0 to 21, who live in Foster Family Agency (FFA) homes in San Diego County." (<http://www.centerforchildren.org/our-services/foster-youth/ffast/> [as of Nov. 27, 2024], archived at <https://perma.cc/6DJW-6NGU>.)

if she returned to Mother's care. The trial court also found the reunification services provided by the Agency were reasonable.

Mother and Minor again appealed. They contended the court erred in determining the Agency provided reasonable services because the ABA services were unreasonably delayed. (*In re I.S.* (Nov. 3, 2021, D078887 [nonpub. opn.].) In our prior opinion we described the obstacles that prevented implementation of ABA assistance. The Agency located an ABA provider near Mother's home within one to two months after the jurisdiction and disposition hearing, but Minor was placed on a waitlist due to staffing shortages. Minor began an assessment with an ABA service provider in January 2021. We concluded, "the delay in securing services [was] at best unfortunate and . . . even troubling." But we affirmed the order based on the deferential standard of review because the juvenile court was in the best position to understand the practical realities in the case and to determine whether the Agency made reasonable efforts to overcome the difficulties in providing services. (*Ibid.*)

C.      *The 18-Month Review Period and Adoption of Permanent Plan*

Following its previous order, the trial court set an 18-month review period that actually extended over the next two years. Minor continued to have tantrums both in and out of school, and Minor often became aggressive when upset. Her behavioral issues increased after she witnessed domestic violence between Mother and Mother's boyfriend.

Staffing and funding issues continued to complicate the Agency's efforts to secure ABA services for Minor. An ABA assessment was completed in February 2021. However, the Agency encountered funding issues when the provider would not accept Minor's insurance. Minor was moved to another foster home in March 2021.

6

In June 2021, the FFAST therapist was still working with Minor on behavioral issues. As of July 2021, Minor was on the waitlist for additional therapy through a second ABA provider.

The second ABA provider began the intake process in September 2021 and insurance approved the services in January 2022. However, it became impossible to schedule the ABA sessions. The ABA provider needed to start Minor's services prior to 4:00 p.m. each day. But, if Minor left school as normally scheduled (3:45 p.m.), she would not even reach her caregiver until 4:00 p.m. Initially, the school said it would allow Minor to leave at 3:00 p.m. on ABA session days. The school then determined that would violate Minor's individual education plan requirements, so the school decided not to allow Minor to leave school early. Additionally, the caregiver was unable to participate in the services due to work, and to responsibilities for children in the home. Either alone, or taken together, these developments thwarted Minor from receiving ABA services.

Minor's placement changed again in April 2022, and ABA services were paused while Minor was placed in a new home. The Agency renewed efforts to identify yet another ABA service provider for Minor and Mother.

In June 2022, a Regional Center coordinator identified a third ABA service provider willing to provide services, but insurance approval for ABA services was still pending in August 2022. Meanwhile, Minor received individual therapy focused on attachment.

In August 2022, Minor told her new caregiver she wanted both to be a girl and to change her name. She asked Mother for a dress and a wig so she could have long hair. Mother told Minor that dresses were for girls. Mother said in various African cultures it's a custom that sometimes men wear dresses. Mother hoped it was a phase and expressed frustration that the

social worker was making a big deal about Minor's request.  The social worker told Mother the Agency wanted to ensure that she and Minor were supported.  The social worker discussed referring Minor, Mother, and the caregiver to TransFamily Support Services and another gender affirming program.

Minor returned to PCC in September 2022 due to maladaptive behaviors and aggression she displayed at her foster home.  Minor was referred to TransFamily Support Services while she was at PCC, but they were unable to begin services until Minor was placed in a foster home.

A fourth ABA service provider assessed Minor in October 2022.  The assessment noted Minor received intensive mental health and behavioral support at school.  The school reported low levels of maladaptive behavior, but they gave Minor a specific and clear behavior plan that Minor knew and followed well.

Minor was placed with another caregiver in November 2022.  The new ABA service provider received authorization to begin services in December 2022, and that provider arranged transportation from the caregiver's home four days a week.

FFAST therapy ended in January 2023 because the caregiver was not approved as a foster family agency home or a county foster home.  The Agency attempted to enroll Minor with a primary therapist.  Minor was on a waitlist for assessment with TransFamily Support Services.  The Agency also submitted a referral for another gender affirming provider.

Minor's caregiver gave notice in January 2023, saying she could no longer continue to care for Minor due to increased aggressive behaviors, tantrums, and disruptions to the house.  Minor returned to PCC in February 2023.

After some delay in obtaining clearance to provide service at PCC, the ABA provider sent staff to PCC for Minor's individual sessions. PCC transported Minor for a social skills group at the provider's clinic.

Minor also received individual therapy at PCC. Minor's special education services at school also included therapy and behavior intervention. Minor's behavioral issues worsened when there was a change of placement, particularly her resistance to getting on the bus to return to PCC after school.

In July 2023, based on an agreement with Mother, the Agency recommended long-term foster care as Minor's permanent plan. Since Minor was not appropriate for adoption and no one was willing to accept legal guardianship, it was not in Minor's best interest to terminate Mother's rights. Mother agreed to terminate reunification services and to forego further challenges regarding provision of reasonable services.

The ABA provider paused Minor's services around this same time due to a severe staffing shortage. The court commented that ABA service had been an issue for a long time and asked the Agency to work to restart the services.

The court adopted the stipulated recommendation and terminated court-mandated reunification services. The court ordered a permanent plan of foster care for Minor, subject to periodic review by the court under section 366.3.

D.    *Postpermanency Review Period*

Minor's placement at PCC continued. The PCC therapist continued working with Minor on coping skills, grounding techniques, and managing triggers for behavioral outbursts related to her posttraumatic stress disorder.

In August 2023, Minor was cleared to attend a monthly Rainbow Play Group at TransFamily Support Services and to access other transgender services if the Agency could facilitate transportation.

The Agency focused its efforts on finding a new placement for Minor. Indeed, in mid-September 2023, the Agency placed Minor in a foster home. But Minor was only there for about a week. Her tantrums escalated, she was physically aggressive with staff members, and she damaged property. At one point, she left the home and ran toward traffic. Due to concerns of self-harming behavior, Minor was hospitalized. The foster home did not feel they could keep Minor safe; Minor was returned to PCC. The ABA service previously paused for staffing problems was now stopped while Minor remained placed at PCC.

In October 2023, a PCC staff member shared concerns with Minor's court appointed special advocate (CASA) that Minor was being "bullied" at PCC due to her gender identity and that staff did not consistently intervene. PCC staff also reportedly withheld a wig to use as an incentive for good behavior. And, Minor apparently threw out her dresses when another child told Minor to stop acting like a girl. When asked if anyone tried to stop the bullying behavior aimed at Minor, a PCC staff member said it was not really "bullying" because "someone was bound to say it." The Agency discussed the concerns with PCC staff and other providers.

Because the Agency was unable to locate a living situation in the county that could handle Minor's needs, the Agency undertook an extensive process to locate and apply for a short-term residential therapeutic program (STRTP) for Minor. They hoped placement at an STRTP would stabilize and control Minor's behaviors, after which the Agency could safely place Minor in a home with a lower level of care. The Agency's request for STRTP

10

placement was approved in November 2023, but the programs willing to accept Minor were outside the county.

The Agency eventually located a specialized foster placement with staff members who could provide services and ensure Minor's safety. Among other services, the home employed a behavioral consultant who could work with Minor to minimize concerning behaviors and to help Minor regulate her emotions. Before placement, staff members from the potential home visited Minor at PCC. Agency staff also took Minor to visit the placement twice in December 2023, and Minor was able to choose her room. The Agency stated that Minor would get TransFamily Support Services for help and family engagement when she was in a new placement. In January 2024, the Agency placed Minor in the new home.

At the first scheduled six-month postpermanency review hearing on January 9, 2024, Minor's counsel raised concerns about the status of ABA services, trauma therapy, and the Agency's efforts to provide gender affirming services, including new clothing. Counsel also requested gender sensitivity training for staff at Minor's new placement and that TransFamily Support Services also get provided. County counsel responded that the Agency only recently placed Minor in a living arrangement outside PCC. However, while at PCC licensing procedures for outside personnel affected the ability of non-PCC professionals to provide services to children at PCC.

The court ordered the Agency to provide Minor with clothing conforming to her gender identity, to enroll her in the Rainbow Play Group, and to make a referral for TransFamily Support Services. Noting that obtaining ABA services was an ongoing issue for years, the court again asked the Agency to prioritize getting ABA assistance for Minor and requested a thorough report regarding those efforts.

11

In a February 2024 addendum report, the Agency stated that one potential trauma therapy provider denied service. It said that it could not safely and meaningfully provide therapy in a private practice setting due to Minor's behavioral issues. An Agency psychologist agreed and recommended that Minor receive ABA services before beginning outpatient therapy.

The addendum further documented the Agency's efforts to secure ABA help since October 2023. Despite the Agency's efforts, there continued to be "struggles in obtaining ABA [services] due to scheduling conflicts and medical insurance issues." When there were difficulties arranging services because of Minor's school schedule, they explored scheduling sessions on weekends or on days when Minor only had a half day of school. The former ABA provider could not accommodate Minor, but it prepared a list of other potential options which Agency staff contacted.

At the pretrial hearing on February 14, 2024, Minor's counsel requested a trial on the issue of whether the Agency provided reasonable services. Although paperwork was in process for enrollment with TransFamily Support Services for Minor to attend the Rainbow Play Group, counsel expressed concern that Minor had not yet gone to Rainbow Play Group, that obtaining ABA services continued to be an issue, and that individual therapy referrals were rejected. Counsel asked the Agency to coordinate training for the staff at Minor's care home about gender identity and caring for transgender youth, including the use of pronouns.

The court reiterated its prior orders for Minor to participate in Rainbow Play Group, to be referred to TransFamily Support Services, and to be provided with gender affirming clothing expeditiously. The court maintained its therapy services order.

E.      *Contested Postpermanency Hearing Leading to Current Appeal*

The contested postpermanency hearing occurred over three days during a six week period:  February 21, 2024, March 11, 2024, and March 29, 2024. The court admitted various reports and heard testimony.

The assigned social worker testified about the extensive efforts to locate a safe and appropriate placement for Minor after the court terminated Mother's reunification services.

The social worker explained Minor received both individual therapy and therapeutic behavioral services at PCC.  The Agency also provided additional support to Minor with a social work intern who contacted Minor once a week.  Both the social worker and the intern tried—and continued to try—to identify an ABA agency for Minor.

Towards the end of February, and prior to the second hearing session, Minor began ABA services.  Further, the new care home received funds for a clothing allowance and took Minor shopping.  Because Minor had not attended the Rainbow Therapy Group, the social worker asked TransFamily Support Services for an update.  The social worker contacted several potential individual therapy providers.

The hearing resumed March 11, 2024. A social worker supervisor testified about efforts she and others made to help Minor with hygiene and haircare needs.  The supervisor recommended braids because they were more age appropriate and easier to care for than a wig.

The Agency asked the court to consider the totality of the services and find reasonable services were provided even if they were not perfect services. County counsel suggested the court set a special hearing for updated information if the court had specific concerns.

13

Minor's counsel asked the court to find the Agency failed to arrange reasonable services for Minor. Counsel said there is "essentially no remedy for a no reasonable services finding at this stage in the case" but asked the court for "a nominal remedy" of saying the Agency did not meet its burden for proving it provided reasonable services. Counsel argued the Agency unreasonably delayed in arranging to start ABA services even after Minor was placed. Counsel expressed concern that Minor should be receiving individual therapy, apart from ABA services. Counsel was also concerned that Minor was not yet participating in the Rainbow Play Group. Minor's counsel also asked the court to set a special hearing for updates on ABA services, therapy, and TransFamily Support Services, including the Rainbow Play Group, as well as training for staff at the placement home.

The court agreed with the Agency that the court could not look at specific services in a vacuum and needed to look at the totality of assistance provided by the Agency during the relevant period. Although the court stated the help provided to Minor were "in no way the best services in the [c]ourt's view" and certainly were "not perfect," the court found the Agency was providing "adequate and reasonable services."

The court, however, noted that both ABA and individual therapy were required by Minor's case plan. The court ordered a special hearing within 30 days to receive updates regarding ABA services, trauma therapy, the Rainbow Play Group, and participation in TransFamily Support Services. The court also ordered a child and family team meeting be held before the next court date "where all of Minor's providers" were to be present, "including the ABA service provider, former therapists, the Regional Center case manager, and any other parties responsible for the minor's mental health and developmental needs." The court wanted the team "to ensure that all of the

14

items on the minor's case plan are in place, and if they are not, that efforts are being taken to ensure that they are all effectuated."

Minor appealed.

## III. DISCUSSION

### A. *Justiciability*

The Agency contends the case is not justiciable because Minor lacks standing as an aggrieved person and the appeal is moot based on postappeal events. We disagree with both contentions.

#### 1. *Standing*

Any party aggrieved by a decision may appeal. (Code Civ. Proc., § 902.) "An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236.) We are required to liberally construe standing and resolve all doubts in favor of the right to appeal. (*Ibid.*; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 948.)

A child generally has standing to appeal a dependency order if she demonstrates the alleged error affects her interests. (*In re Crystal J.* (2001) 92 Cal.App.4th 186, 189 (*Crystal J.*).) Among the rights afforded by statute to a child in foster care is the right to "access and receive medical, dental, vision, mental health, and substance use disorder services, and reproductive and sexual health care, with reasonable promptness that meets the needs of the child." (§ 16001.9, subd. (a)(22)(A).)

Although there is no statutory penalty for failing to afford a foster child the rights enumerated in section 16001.9, the parties and the court should ensure children in foster care receive those rights to safeguard the safety, protection, and physical and emotional well-being of such children. (1 Seiser

15

& Kumli, Cal. Juvenile Courts Practice and Procedure (2024) § 2.62.) Accordingly, the juvenile court has discretion to fashion an appropriate order to ensure adequate services are provided.

*Crystal J., supra*, is inapposite. There the child did not have standing to challenge an order denying de facto parent status to potential caregivers because her own rights as a party to the dependency proceeding were not impinged by the order. In *Crystal J.*, an order denying de facto parent status only affected the rights of the individuals requesting de facto parent status. That status permitted the potential de facto parents to be present, to be represented, and to present evidence in a dependency proceeding. The child, who was already a party to the action, had those rights regardless of whether the trial court granted the adults de facto parent status. (*Crystal J., supra*, 92 Cal.App.4th at p. 191.)

In contrast, if the court errs in finding adequate services in the postpermanency period or does not make an appropriate order to ensure the provision of adequate services to meet the child's needs, the child's interests are directly impinged. In the instant matter Minor contends the Agency's failure to timely provide ABA services, trauma therapy, and gender affirming services caused her emotional and psychological harm. Minor contends the juvenile court's findings regarding adequacy of services may injuriously affect her rights to timely and adequate services going forward. Although Minor does not clearly identify the injurious affect of the court's ruling, we will liberally construe the question about standing in favor of Minor's right to appeal the juvenile court's postpermanency finding regarding adequacy of services, as well as the related discretionary order.

16

2.    *Mootness*

The Agency next contends the issues on appeal have become moot after this appeal was filed and we cannot grant effective relief because Minor is now receiving the services. We granted a request for judicial notice and two motions to augment the record on appeal to add minute orders arising from hearings conducted from April 2024 through July 2024. Consequently, we are aware that during the pendency of this appeal, the juvenile court has continued to monitor the status of Minor's services. However, we decline to consider postappeal developments to determine whether the issues on appeal are now moot.

We ordinarily must review a trial court's judgment based on the record "as it existed when the trial court ruled." (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102.) The Agency's argument that postappeal events render the appellate issues moot, " 'necessarily requires that we treat the factual assertions [in the postappeal reports and orders] as undisputed, which we cannot do.' " "[A]bsent exceptional circumstances, '[t]his type of factfinding is precisely what must occur in the juvenile court in the first instance [citation], where additional and possibly competing evidence may be offered; and the court, on a more fully developed record, will assess weight and credibility as appropriate, and make its factual findings.' " (*Ibid.*)

We are encouraged to see the juvenile court continues to monitor Minor's services and that Minor appears to be making progress. But it is the juvenile court, not this court, that will initially make a factual determination about whether the Agency provided adequate services in the period after Minor initiated the current appeal.

B.    *Adequacy of Service in Relevant Postpermanency Period*

We turn our focus, then, to Minor's primary contention:  that the trial court lacked substantial evidence to find the Agency provided to Minor adequate services between July 2023 and January 2024.

1.    *Legal Principles*

When a child is removed from the custody of a parent, the juvenile court must order the agency to provide child welfare services to the minor and the minor's parent(s) or guardian(s) to facilitate family reunification. (§ 361.5, subd. (a).)  Reasonable services during the reunification period are a statutorily required benefit, but there is "no constitutional 'entitlement' to these services." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 475.)

Although services are offered throughout juvenile dependency proceedings, "these services are treated differently by statute at different stages.  If the juvenile court finds that reasonable services have not been provided during the earliest stage, the first 12 months of the reunification period, the court is prohibited from terminating services and must order that additional services be provided." (*In re Christian K.* (2018) 21 Cal.App.5th 620, 627 (*Christian K.*).)  The court may exercise its discretion to extend reunification services up to 24 months, under certain conditions. (*Ibid.*)

After the court terminates reunification services for a parent, the focus shifts away from reunification to providing permanency and stability for the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  If a child cannot be returned to the home or placed for adoption, "services are intended to provide an alternate permanent family structure." (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 511; § 16501, subd. (i)(1).)

When the permanent plan selected for a child is long-term foster care and parental rights are not terminated, either the local agency or the juvenile

18

court must review the status of the child and the case plan every six months. At a minimum, the juvenile court itself must review the child's status every 12 months.  (§ 366.3, subd. (d)(1)(D); Cal. Rules of Court, rule 5.740(b).)

At the review hearing, section 366.3 requires the court or the agency to "inquire about" the progress made to provide a permanent home for the child, the safety of the child, and to make certain findings.  (§ 366.3, subd. (e).) These determinations include the "continuing necessity for, and appropriateness of, the placement" (*id.*, subd. (e)(1)), the "continuing appropriateness and extent of compliance with the permanent plan for the child" (*id.*, subd. (e)(3)), the "extent of the agency's compliance with the child welfare services case plan . . . to complete whatever steps are necessary to finalize the permanent placement of the child" (*id.*, subd. (e)(4)), and the "adequacy of services provided to the child" (*id.*, subd. (e)(6)).

Section 366.3 "does not mandate a particular consequence if adequate services are not provided" in the postpermanency phase.  (*Christian K., supra*, 21 Cal.App.5th at p. 627.)  Instead, the court retains discretion to fashion an appropriate order to protect a child's stability and to expedite a permanent placement, "which may or may not include further services— regardless of whether services are found to have been wanting." (*Ibid.*)  Such authority is consistent with the overarching goal of dependency proceedings to "ensure the safety, protection, and physical and emotional well-being of children" within the juvenile court's jurisdiction.  Protecting the physical and emotional well-being of a child "may include provision of a full array of social and health services to help the child." (§ 300.2, subd. (a).)  Unlike at earlier stages of dependency where there is a remedy for inadequate past services, the focus of statutory inquiry under section 366.3 requires the court to look at

the child's current circumstances so the court and the Agency can address any deficiencies and achieve stability for the child.

Here, we use two standards of review. First, we review for substantial evidence a juvenile court's factual findings regarding the adequacy of services. But we look at any discretionary orders based on those findings for abuse of discretion. (*In re Caden C.* (2021) 11 Cal.5th 614, 640–641 [comparing substantial evidence and abuse of discretion standards of review].)

> 2. *Application*

In this case, as required by section 366.3, the court inquired about and considered the services provided to Minor between July 2023 and January 2024, which the parties agree is the relevant review period.

The statutory scheme does not define "adequate services." The dictionary definition of the adjective "adequate" is "sufficient for a specified or implied requirement" or "lawfully and reasonably sufficient." (Webster 3d New Internat. Dict. (2002) p. 25, col. 3.) The parties, including Minor's counsel, and the court described the applicable standard to measure services as "reasonable." But this may be interpreted to suggest a higher standard than the statutory term "adequate."

*Christian K., supra*, 21 Cal.App.5th at page 628, is instructive here. That court rejected the "false premise" that the juvenile court was first required to find an agency provided adequate[6] services to a minor before the trial court could exercise its discretion to permit a child to travel out of the

---

[6] We note the appellate court used the term "reasonable services," but we read that to mean "adequate services" given the context of the sentence. The court wrote immediately prior that "[t]here is no dispute that the juvenile court was required to consider and determine the *adequacy* of services . . . ." (*Christian K., supra*, 21 Cal.App.5th at p. 627, italics added.)

20

country to visit potential new caregivers. The *Christian K.* court concluded the juvenile court properly "considered" services currently provided to the child, even if they "were imperfect, unreasonable, or inadequate," before making a discretionary order allowing travel that could lead to a new placement that would protect the stability of the child. (*Ibid.*)

We need not define the contours of an "adequate services" finding under section 366.3. Rather, our review of the record demonstrates substantial evidence supports the juvenile court's findings that (1) the Agency was generally providing Minor with adequate and reasonable services, considering the totality of the evidence, but (2) progress on providing ABA services, trauma therapy, and transgender services needed further action and monitoring.

During the relevant postpermanency review period, the Agency properly focused its efforts on exploring options for safe and appropriate placement so Minor could move out of the PCC emergency shelter. As the juvenile court noted, PCC is meant to provide temporary placement. But significant challenges impeded placing Minor due to her special needs, even with many Agency personnel involved in locating suitable options.

Further, the record indicates the Agency explored many options to restart ABA therapy while Minor was at PCC in addition to efforts to provide gender affirming support. The ability to provide services, and ABA therapy in particular, was limited by availability of special providers, licensing issues regarding who could provide service at PCC, and scheduling issues related to Minor's special education.

However, while awaiting placement, Minor received services at PCC. This included individual therapy that worked on coping skills, grounding techniques, and managing behavioral outbursts related to posttraumatic

21

stress triggers. Minor also received therapeutic behavioral services. The record does not indicate whether Minor's individual therapy at PCC included aspects of ABA therapy, but it does reflect efforts to address her behavioral issues within the scope of assistance provided to Minor. This was in addition to a variety of services provided to Minor at school, which also focused on behavioral issues.

After a failed placement attempt in September 2023, the Agency ultimately located a specialized care home for Minor that could provide her services including a behavioral consultant. To help Minor adjust well to the placement, staff members from the potential home visited with Minor at PCC, and the Agency took Minor to visit the potential home twice before actually placing Minor there in January 2024. Given Minor's history of numerous unsuccessful residences, this incremental approach to ensure a proper living situation appears reasonable.

Further, the Agency identified an ABA provider and, once Minor settled into her new placement in January 2024, the Agency began the involved process to get services started.

The Agency also searched for individual therapists who could safely work with Minor in an outpatient setting. After a therapy provider rejected a referral due to safety concerns, the social worker got an agency psychologist to review the matter. The agency psychologist told the social worker given Minor's new living situation, she should start with ABA services before restarting individual therapy. The court acknowledged that therapy and ABA services are distinct aspects of Minor's case plan but found the social worker took appropriate steps when receiving the therapist's denial.

The court also considered whether the Agency provided appropriate services for Minor's gender identity. The court emphasized that children

have the right to a placement that is respectful of their gender identity and expression. The court said it requested, but did not receive, evidence about whether Minor's new placement lacked training about gender sensitivity.

The court considered the entirety of services provided to Minor and determined the Agency was providing reasonable services[7] under the circumstances, even though they were "in no way the best services" and certainly were "not perfect." The record supports this finding.

We do not read the statutory requirement for the court to consider the "adequacy of services provided to the child" to mean the child must receive perfect services. (§ 366.3, subd. (e)(6).) Even during the reunification stage, "services need not be perfect but only reasonable under the circumstances." (*Christian K., supra*, 21 Cal.App.5th at p. 628, fn. 5.)

But the court's finding does not mean the court was satisfied with all aspects of Minor's services. To the contrary, the court expressed serious concern that ABA therapy and individual therapy were not yet implemented. The court also heard concerns from Minor's counsel that Minor had not yet participated in the Rainbow Play Group although the court ordered that at a hearing in January 2024. Consequently, as requested by both Minor's counsel and the Agency, the court set a special hearing within 30 days to receive an update about ABA services, trauma therapy, Minor's participation in the Rainbow Play Group, and TransFamily Support Services. The court also directed the Agency to hold a child and family team meeting before that hearing with all providers and stakeholders to ensure each of the items on Minor's case plan were in place.

---

[7] In the context of this record, we read the court's finding to mean "[t]he adequacy of services provided to the child." (See § 366.3, subd. (e)(6).)

23

The record shows the court considered and decided the adequacy of Minor's services as required by section 366.3. (*Christian K., supra*, 21 Cal.App.5th at p. 628.) Substantial evidence supported the court's findings. The court then properly exercised its discretion to fashion an order to protect Minor by ensuring the Agency expeditiously addresses any deficiencies in service and implements Minor's case plan.

C.    *Equal Protection*

Minor contends section 366.3, subdivision (e) violates her "right to equal protection" because the statute only requires the court to "review the adequacy of the services provided to the child" and "the need for and progress in providing the assistance and services described" but "[t]ransgender youth are disproportionately going to be unable to obtain services ordered, specifically gender-affirming services, as evident in this case." We disagree.

A party asserting an equal protection challenge must first establish that "the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal. 3d 522, 530, italics omitted.) If such a classification exists, the next inquiry is to determine whether to apply a strict scrutiny or rational basis standard. (*Warden v. State Bar* (1999) 21 Cal.4th 628, 644, 652; see also *In re H.K.* (2013) 217 Cal.App.4th 1422, 1433.) We independently review questions of constitutionality and statutory interpretation. (*Yohner v. California Dept. of Justice* (2015) 237 Cal.App.4th 1, 12.)

To assess the constitutionality of section 366.3, subdivision (e), "we consider its purpose and how it operates within the context of the statutory scheme." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 473.)

Facially, section 366.3, subdivision (e) does not adopt a classification that affects two or more similarly situated groups in an unequal manner.

24

Instead, it describes the areas the juvenile court or the reviewing agency must consider on a regular basis to ensure the appropriateness and extent of compliance with any foster child's permanent plan, the case plan, and the adequacy of services provided to the child. The juvenile court must review the status of services in the context of the entire applicable statutory scheme.

Children in foster care have an array of rights outlined in section 16001.9 to ensure their health and well-being. In enacting and amending section 16001.9, the Legislature expressly declared its intent is "to ensure the health and well-being of *all* foster children . . . , *including those who are transgender or gender nonconforming*." (Stats. 2018, ch. 385, § 1, subd. (a), as amended by Stats. 2019, ch. 497, § 327, italics added.)

Several provisions of section 16001.9 specifically support and affirm gender identity and expression. For example, foster children have a right to placement according to their gender identity and to be referred to by their preferred name and gender pronouns. (§ 16001.9, subd. (a)(19)). They have a right to fair and equal access to all available services and not to be subjected to discrimination or harassment based on gender identity or expression. (*Id.*, subd. (a)(17).) They have rights to receive adequate clothing, grooming, and hygiene products that respect their gender identity and expression (*id.*, subd. (a)(3)); to access gender affirming health care and mental health care (*id.*, subd. (a)(22)(A)); to have caregivers and child welfare personnel who have received instruction regarding sensitivity related to gender identity and expression (*id.*, subd. (a)(18)); and to participate in extracurricular and social activities consistent with their gender identity and expression (*id.*, subd. (a)(16).)

Minor contends her difficulty in accessing services in this case shows transgender youth are treated differently from cisgender youth, making

transgender children "incapable of receiving adequate gender affirming services." We are not persuaded.

In conducting its section 366.3, subdivision (e) review, the juvenile court was mindful of section 16001.9. It acknowledged that "minors have a right to be in a placement, whether it be in foster care or otherwise, which is respectful of their gender identity and expression."

Unlike *Norswoorthy v. Beard* (2015) 87 F.Supp.3d 1104, 1120, relied on by Minor, no evidence in this case supports that the Agency or aid providersdenied services to Minor based on her status as a transgender youth.

The record shows the Agency worked to arrange for gender affirming services while Minor was at PCC. Beyond making a referral to TransFamily Support Services, the Agency also made efforts to help Minor with gender affirming hygiene and hair care. The social worker supervisor, who testified that she identifies as a Black woman with natural hair that is the same grade and texture as Minor, considered Minor's behavioral issues around bath time and wondered if Minor had a concern about her hair. The social worker supervisor and the assigned intern worked with PCC to allow Minor to take baths instead of a shower. They also put together a package of bubble bath items and a bonnet for Minor's hair to use while she slept. They investigated funding to provide Minor with wigs or braids. They provided braids on one occasion, which Minor declined to repeat.

The Agency obtained a clothing allowance and provided dresses for Minor in October 2023 while she was at PCC. Unfortunately, Minor threw the dresses away after another child at PCC made an insensitive comment about wearing dresses.

When a concern was raised about how PCC staff handled the insensitive comment and used a wig provided by Minor's CASA as a behavioral incentive, the Agency discussed the issue with PCC staff. The Agency also provided Minor with emotional support and strategies for resilience when faced with negative comments.

The Agency resubmitted the request for a clothing allowance, which was declined as repetitive. The Agency elevated the request but regrettably still encountered delays with it. The request was eventually approved, and in February 2024 staff received a check so the new placement providers could take Minor shopping.

Minor's counsel complains that certain reports did not refer to Minor by her preferred pronouns. However, between August 2022 until June 2023, Minor asked to be referred to by different names and pronouns depending on the person to whom she spoke. In June 2023, Minor asked to be referred to by her given name with the pronouns she/her/hers. The Agency respected Minor's request to be referred to by female pronouns in subsequent reports.

Counsel faults a PCC therapist for discussing gender expression with Minor when she first asked the therapist to use she/her/hers pronouns in late May 2023. The record reflects otherwise. The therapist tried to understand Minor's wishes since Minor had made different requests to different individuals about her preference for names and pronouns. The therapist considered whether Minor gravitated toward female pronouns so she can safely wear dresses because Minor said she thought boys who wore dresses were "gay," which Minor interpreted to mean "ugly." The therapist told Minor the term gay does not mean ugly. She did not challenge Minor's gender expression but challenged the belief that boys who wear dresses are ugly. The therapist explained that both boys and girls can enjoy wearing

dresses if it feels right and it is not ugly to do so.  The therapist praised Minor for being herself.  The therapist noted the discussion was an interesting insight into Minor's current thought process related to gender and was worth noting for future clinicians.

Minor completed an intake form for TransFamily Support Services in June 2023.  It is unfortunate there were delays in connecting Minor with the Rainbow Play Group and TransFamily Support Services.  However, as already described, the record before us shows these issues were primarily related to Minor's temporary placement at PCC, not related to discrimination against Minor based on her gender identity or expression.

The juvenile court was aware of the responsibility to provide Minor with gender affirming services and ordered the Agency to provide them. When the services were not in place at the contested postpermanency review hearing, the court ordered the Agency to include an update about them in a report for a special hearing.  The court also requested information about the Agency's progress in providing gender identity training for staff members at Minor's placement.  This was an appropriate exercise of the court's discretion.

As with other services discussed, the Agency's efforts to provide Minor with timely gender affirming care and support were not perfect.  But Minor fails to establish that the state adopted a classification that affected Minor's access to services as a transgender youth in an unequal manner or denied her the same legal protections enjoyed by other foster children in similar circumstances.

## IV.  DISPOSITION

The order is affirmed.


RUBIN, J.

I CONCUR:


HUFFMAN, Acting P. J.

BUCHANAN, J., Dissenting.

I disagree with the majority's conclusion that I.S. (Minor) has standing to appeal the juvenile court's finding that she received adequate services for the six-month period ending in January 2024. In my view, Minor was not aggrieved by this finding because it has no consequences; the juvenile court in the same order took measures to ensure she received all the relevant services in the future; and Minor does not contend that these measures were insufficient. I would therefore dismiss the appeal for lack of standing. I also write separately, however, to explain my view that the record does not in fact support the juvenile court's finding that Minor received adequate services for the six-month period ending in January 2024. Specifically, Minor did not receive any of the applied behavioral analysis (ABA) services that were part of her case plan all along and that the juvenile court itself acknowledged were necessary to address her extreme behavioral issues related to autism.

I

"Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal." (*In re K.C.* (2011) 52 Cal.4th 231, 236; see Code Civ. Proc., § 902 ["Any party aggrieved may appeal . . . ."].) For standing purposes, an aggrieved party "is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.*, at p. 236.)

Minor here only challenges the portion of the juvenile court's order finding that she received adequate services during the six-month period from July 2023 through January 2024. Minor was not aggrieved by this finding because it carried no legal consequences and did not injuriously affect her

1

rights or interests in any immediate and substantial way. As the majority notes, the statute requires the juvenile court to make a finding as to "the adequacy of the services provided to the child" (§ 366.3, subd. (e)(6)), but it "does not mandate a particular consequence if adequate services are not provided." (*In re Christian K.* (2018) 21 Cal.App.5th 620, 627.) "Because no consequence is mandated for the failure to provide reasonable services, the statute confers discretion upon the court to issue any appropriate order to protect a child's stability and to expedite the child's permanent placement— which may or may not include further services—*regardless of whether services are found to have been wanting*." (*Ibid.*, italics added.)

Although a finding of inadequate services carries no mandatory consequences, I would agree that Minor was aggrieved by the juvenile court's finding of adequate services *if* it were based on a determination that she was not entitled to the services requested and therefore would not receive them in the future. Then I could see how Minor's interests were injuriously affected. But the juvenile court here agreed that Minor was entitled to all the services she was requesting. ABA services, individual therapy, and Trans Family Support services were all part of Minor's case plan at the time of the juvenile court's order. And the juvenile court did exactly what Minor's counsel asked it to do to ensure she would receive these services in the future by scheduling a special hearing for 30 days later to receive updates on the provision of ABA services, trauma therapy, and Trans Family Support services (including the Rainbow Play Group). Moreover, the court ordered a child and family team meeting to be held before the next court date with all of Minor's providers present and stated: "The purpose of the meeting is *to ensure that all of the items* [*in Minor's*] *case plan are in place*, and if they are not, that efforts are being taken to ensure that they are all effectuated." (Italics added.) The

court also made clear that Minor had a right to have her gender identity respected and demanded confirmation that the staff at her current placement had received appropriate gender identity training.[1]

In these circumstances, I do not see how Minor was aggrieved by the juvenile court's finding as to past services. As I explain below, I agree that she was aggrieved by the Agency's failure to provide adequate services for the six months ending in January 2024, and I do not doubt that this caused her emotional and psychological harm, but that is not the relevant question for standing purposes. To have standing to appeal, a party's rights or interests must be "injuriously affected *by the judgment*." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737, italics added; see also *Serrano v. Stefan Merli Plastering Co., Inc.* (2008) 162 Cal.App.4th 1014, 1026 [aggrieved party must be "adversely affected by the judgment or order" on appeal].) Here, Minor was not injuriously affected by the finding she is appealing. Her conjecture that this finding might hypothetically affect her rights to services going forward is not sufficient to confer standing to appeal. (See, e.g., *In re Cody R.* (2018) 30 Cal.App.5th 381, 390 ["Speculation about a hypothetical situation is not sufficient to support standing."].) This is not an "immediate and substantial" injury; it is merely a "remote" possibility. (*In re K.C.*, *supra*, 52 Cal.4th at p. 236.)

To illustrate the point, even if we were to conclude that Minor did not receive adequate services from July 2023 through January 2024, we could do nothing more than order provision of the services Minor argues she should have received, which the juvenile court has already directed as part of the very order Minor is appealing. In other words, a reversal of this finding

---

[1] Minor's counsel acknowledged at the hearing that Minor "finally has the dresses that she needs, clothes that affirm her gender identity . . . ."

would make no actual difference to Minor's current situation. I would therefore dismiss the appeal for lack of standing.

## II

Although I do not believe we should reach the merits, I disagree with the majority on that issue as well. For years, everyone involved in this case has understood that ABA services are critical to assist Minor in addressing her extreme behavioral issues related to autism. Already in our prior opinion three years ago, we expressed concerns about the "unfortunate and perhaps even troubling" delays in providing these ABA services to Minor. (*In re I.S.* (Nov. 3, 2021, D078887) [nonpub. opn.].) Yet even more delays followed. Except intermittently for a few months before July 2023, Minor received no ABA services after our prior opinion of November 2021 and before the juvenile court's March 2024 order at issue in this appeal. More to the point, ABA services were still part of Minor's case plan throughout the six-month period from July 2023 to January 2024, but none were provided to her in this time frame. For this reason alone, I believe the record does not support the juvenile court's finding that adequate services were provided to Minor for that six-month period.

"Applied behavioral analysis (ABA) is an intensive form of therapy which has had documented success in treating the symptoms of autism in young children." (*Consumer Watchdog v. Department of Managed Health Care* (2014) 225 Cal.App.4th 862, 867.) ABA "develops or restores, to the maximum extent practicable, the functioning of an individual with autism. [Citation.] Numerous studies indicate that ABA is the most effective treatment known for autistic children. Studies also demonstrate that ABA has lasting results. . . . ABA therapy can create new brain connections in a child with autism; these new connections are to be contrasted with the

4

abnormal connections caused by autism." (*Id.* at p. 868.) ABA providers work intensely with autistic children to alleviate behavioral issues. The Agency itself acknowledges that this type of therapy "can improve social, communication, and learning skills through reinforcement strategies."

As we noted in our prior opinion, "ABA services were a central component of the case plan" for Minor. (*In re I.S., supra*, D078887.) Minor was diagnosed with autism at a young age and had extreme behavioral issues. As early as 2020, when Minor was only six years old, the Agency identified the need for ABA services. These services were deemed necessary to address Minor's behavioral issues. As of March 2021, Minor's psychiatrist, her therapist, a behavioral specialist, and a clinician who provided therapeutic supervision for visits with her mother all agreed Minor "should be receiving ABA services for behavioral issues related to Autism, but [s]he is not."

In August 2021, the juvenile court noted that ABA services "had been requested and pending for, I think, more than a year." In October 2021, the juvenile court acknowledged that "ABA is the standard of care for children with [Minor]'s issues, and there have been a lot of obstacles to getting [her] into that service . . . ." In March 2022, four months after our prior opinion expressing concern about the delays in providing ABA services, the juvenile court granted the agency's request for still more time to do so. At the time of subsequent hearings held in September and November 2022, ABA services were still not being provided. In December 2022, Minor finally started receiving ABA services, but they stopped after a couple of months before being resumed in June 2023 and halted again by the first week of July 2023. In the entire three years before July 2023, she received only three months of ABA services. In early July 2023, the juvenile court again asked the Agency

5

to "continue to look into ABA services" and noted "that's been a problem for a long time now with services starting or not starting and then being put on pause."

Thereafter, ABA services continued to be part of Minor's case plan throughout the six-month period at issue here from July 2023 to January 2024. Nevertheless, Minor did not receive any further ABA services during this period. The juvenile court itself recognized this was a significant problem. At a hearing in January 2024, the court ordered that the provision of ABA services "remain elevated" as an Agency priority and noted that this had "been an ongoing issue for not just one year but for a number of years at this point." The next month, the court again inquired "whether there were any efforts to perhaps resolve the issue of the ABA services being cognizant of everyone having [Minor's] best interests in mind and that *these do appear to be services that have been previously ordered and that* [*Minor*] *is in need of.*" (Italics added.)

On this record, the conclusion is inescapable that Minor did not receive adequate services during the six-month period ending in January 2024. Minor did not receive a critical behavioral health service that was a central component of her case plan for years, that was necessary to address her behavioral issues related to autism, and that everyone including the juvenile court agreed she needed. For this reason, substantial evidence does not support the juvenile court's finding that adequate services were provided to Minor for this time period.

The mere fact that the juvenile court considered the entirety of the services provided to Minor does not alter this conclusion. None of the services provided to Minor served the purpose or function of the ABA services that were an essential part of her case plan. The juvenile court did not

6

identify any other service that addressed Minor's severe behavioral health issues related to autism. According to the Agency's own staff psychologist, individual therapy was not appropriate as a substitute for ABA services. A child in foster care has a right to physical and mental health services "that meet[] the needs of the child . . . ." (§ 16001.9, subd. (a)(22)(A).) No one disputes that ABA services were a critical need for this child. The juvenile court itself found ABA services were the "standard of care" for children with her issues and she was "in need of" them to address her behavioral issues. Yet she did not receive them during this six-month period—and she barely received any in the three years before that. Because a vital service was not provided, the overall services were inadequate.

Nor does it make any difference that the Agency may have made reasonable efforts to arrange for ABA services.[2] By its terms, the statute requires the juvenile court to evaluate "[t]he adequacy of *services provided to the child*" (§ 366.3, subd. (e)(6), italics added), not the adequacy of the Agency's *efforts* to provide services. The point is not to grade the Agency's efforts but to determine whether the child is receiving the services she needs. Indeed, the Legislature knew how to employ a "reasonable efforts" standard when it intended to. In contrast to the "services provided" provision (*ibid.*), some of the other required findings in the same subdivision explicitly refer to a "reasonable efforts" standard. (See, e.g., § 366.3, subd. (e)(4) [agency's "reasonable efforts" to return child to parent's home or finalize permanent placement]; *id.*, subd. (e)(11) ["Whether or not reasonable efforts to make and finalize a permanent placement for the child have been made."].) When the

_____

2    I say "may have made reasonable efforts" because the social worker admitted she made no contacts to seek an ABA provider for Minor in the first three months of the six-month period at issue here.

7

Legislature uses different language in one part of a statute than it does in other sections concerning a related subject, it must be presumed the Legislature intended a different meaning. (See *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73 ["When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning."].)

Finally, the fact that the Agency was focused on finding a placement for Minor also has no bearing on the adequacy of the services provided. As noted, these are separate determinations the juvenile court must make under the statute: whether the Agency has made reasonable efforts to find a permanent placement (§ 366.3, subds. (e)(4) & (11)) and whether adequate services have been provided to the child (*id.*, subd. (e)(6)). Even the Agency's social work supervisor acknowledged that the Agency was obligated "not only [to] find her an appropriate placement, but also services." The Agency's exercise of reasonable efforts to find a placement therefore has no relevance to the separate question of whether the child received adequate services.

On this record, no substantial evidence supports the juvenile court's finding that adequate services were provided to Minor from July 2023 to January 2024. Accordingly, I dissent from the majority's opinion both on standing to appeal and the merits of the adequate services issue.

BUCHANAN, J.

8